# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
February 5, 2002 Session

## STATE OF TENNESSEE v. WILLIAM R. STEVENS

**Automatic Appeal from the Court of Criminal Appeals**
**Criminal Court for Davidson County**
**No. 98-A-825    Hon. Steve Dozier, Judge**

---

**No. M1999-02067-SC-DDT-DD - Filed May 14, 2002**

---

The defendant was found guilty by a Davidson County jury of hiring eighteen year-old Corey Milliken to murder his wife, Sandra Jean Stevens, and his mother-in-law, Myrtle Wilson. He was also convicted of especially aggravated robbery. The jury found two aggravating circumstances: (1) The defendant was previously convicted of one or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person, Tenn. Code Ann. § 39-13-204(i)(2); and (2) the defendant employed another to commit the murders for the promise of remuneration, Tenn. Code Ann. § 39-13-204(i)(4). Finding that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt, the jury sentenced the defendant to death for the murder of each victim. On the especially aggravated robbery conviction, the court sentenced the defendant to life without parole as a repeat violent offender with the sentence to run consecutively to both death sentences. The Court of Criminal Appeals affirmed the defendant's convictions and sentences of death. On automatic appeal to this Court, we affirm and hold as follows: (1) the trial court did not abuse its discretion in limiting the testimony of defendant's crime scene expert to his analysis of the evidence at the crime scene; (2) the trial court's exclusion of the testimony of Corey Milliken's foster father regarding Milliken's prior bad acts constituted harmless error; (3) the trial court applied hearsay and other evidentiary rulings in an unbiased and even-handed manner; and (4) the sentence of death is not disproportionate to the sentence imposed in similar cases. For all other issues not specifically discussed in this opinion, we agree with and affirm the judgment of the Court of Criminal Appeals.

**Tenn. Code Ann. § 39-13-206(a)(1) Automatic Appeal;**
**Judgment of the Court of Criminal Appeals Affirmed**

WILLIAM M. BARKER, J., delivered the opinion of the court, in which FRANK F. DROWOTA, III, C.J., and E. RILEY ANDERSON and JANICE M. HOLDER, JJ., joined. ADOLPHO A. BIRCH, JR., J., filed a concurring and dissenting opinion.

Brock Mehler and F. Michie Gibson, Nashville, Tennessee, for the appellant, William R. Stevens.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Jennifer L. Smith, Assistant Attorney General, Nashville, Tennessee, for the appellee, State of Tennessee.

**OPINION**

**FACTS**
**Guilt Phase**

On December 22, 1997, police were dispatched to the defendant's, William Richard Stevens's, mobile home in Nashville in response to a 911 call made by the defendant and eighteen year-old Corey Milliken. When the police arrived, they found the murdered bodies of forty-five year-old Sandra (Sandi) Jean Stevens, the defendant's wife, and seventy-five year-old Myrtle Wilson, the defendant's mother-in-law. After further investigation, the police concluded that Corey Milliken was hired by the defendant to kill the women and to make the murders look like they were committed in furtherance of a burglary.[1]

The record reveals that the defendant and Milliken had known each other for approximately one year. Milliken and his then fifteen year-old brother, Shawn Austin, lived with their mother and step-father three trailers down from the defendant. Both boys often worked for the defendant, assisting him in his job of putting underskirting on mobile homes. Austin testified at trial that his brother had a close relationship with the defendant and that he and his brother spent a lot of their free time at the defendant's trailer.

Austin testified that in the fall of 1997, the defendant approached both brothers and asked them if they would kill the defendant's ex-wife, Vickie Stevens. The defendant instructed them to "get a rifle" and shoot her when she came out of her trailer. He told them that if she were dead, he would get full custody of his then nine year-old son, John. He would also get "her car, her trailer and her land."

However, around Thanksgiving, the defendant changed his mind and offered to pay Milliken and Austin $2,500 apiece if they would instead kill his current wife, Sandi Stevens, and his mother-in-law, Myrtle Wilson. The defendant and his wife were having marital problems, and he knew that another divorce would "wipe him out." He told the boys that he would get the money either from the proceeds of Ms. Wilson's life insurance policy or from the proceeds of a yard sale. Austin would act as a "lookout," while Milliken killed the victims in their trailer. The defendant preferred that the victims be shot; however, if the boys could not find a gun with a silencer, Milliken was to kill them

---

[1] It is undisputed that Milliken killed the victims. He pleaded guilty to first degree murder shortly before his trial was set to begin and was sentenced to life imprisonment.

using a knife. Austin eventually decided that he did not want to be the "lookout," but agreed to provide an alibi for the defendant. He would not be paid for this participation, and therefore the entire $5,000 would be paid to Milliken.

Although the defendant had not yet set a date for these murders, he took great pains in planning and instructing Milliken on exactly how the murders were to take place. For instance, he told Milliken to kill his mother-in-law first because his wife would not hear anything: she kept her door shut and the fan running in her bedroom. He also told Milliken that on the eve of the murders, the trailer would be unlocked, and the burglar alarm would not be set; as an extra precaution, Milliken would be given a key to the trailer.

The defendant further instructed that after Milliken killed the victims, he was to steal certain items, including some of Mrs. Stevens's jewelry, and then "destroy" the trailer to make it look like a robbery had occurred. In fact, he took Milliken on a walk-through of the trailer, and he specified which items were to be stolen, which items were to be "trashed," and which items were to remain untouched, such as "the TV and the dishes and [his] Star Trek collection."

The defendant also instructed Milliken on how he was to get rid of the evidence. For instance, Milliken was to take the stolen jewelry and put it in a bag. He would then throw the murder weapon on top of a nearby school building and throw the bag of stolen items into the river. Once all the evidence was disposed of, he would go to his girlfriend's house to establish an alibi.

According to the defendant's plan, on the morning of the murders, he and Austin would leave together to go to work. Milliken would commit the crimes while they were gone. The defendant told Austin that if he was questioned by the police, he was to tell them that he saw Mrs. Stevens wave to them that morning as they left for work. The defendant also told the brothers that if anybody got caught, "everybody was on their own." Furthermore, he instructed them not to take lie detector tests or "snitch on the other person."

Finally, a few days before December 22, 1997, the defendant told the brothers that the murders needed to be committed on the twenty-second. He explained that his ex-wife was going to have back surgery at that time, and he would have his nine year-old son, John, staying with him. John would act as another alibi. Milliken agreed to commit the murders on that date.

At approximately 4:45 on the morning of Monday, December 22, Austin went over to the defendant's trailer where the defendant and his young son were waiting for him. Milliken was still asleep because he had stayed up late the night before after having had an argument with his mother and step-father. Mrs. Stevens and Ms. Wilson were also still asleep in their rooms and did not see the defendant and the two boys leave for work.

-3-

The threesome drove approximately ninety miles to their jobsite at New Johnsonville,[2] stopping for breakfast along the way. After they arrived, the defendant decided that it was too muddy to work on the trailer, so they returned home, arriving back at the trailer park at around 8:30 a.m.

In a taped statement given on the day of his arrest, the defendant said that when he walked up to the front door of his trailer, he observed that the door was ajar. When he stepped inside, he noticed that the Christmas tree was lying on its side and that "stuff was laying all over," and he "knew something was wrong." He looked towards his bedroom, saw his wife's leg "laying across the bed," and immediately assumed that both his wife and his mother-in-law were dead. The defendant said that he never went into either bedroom to actually check on the women, nor did he ever see his mother-in-law's body. Instead, he just "ran out" with his son and Austin and went to Austin's trailer to call the police.

Officers Gary Clements and John Donnelly of the Metro Police Department were the first officers to arrive at the crime scene. After entering the trailer and finding the two bodies, the officers sealed off the crime scene and then began canvassing the area for witnesses and searching the grounds for physical evidence. Officer Clements soon met Corey Milliken in his trailer and started talking to him. During their conversation, he noticed blood spots on Milliken's t-shirt, blood under his nails, and fresh gouge marks on his cheek and wrist. Officer Clements eventually turned Milliken over to detectives for further questioning. Milliken confessed to committing the murders by himself and provided a detailed description of the murders and the crime scene.

Continuing his search for evidence, Officer Clements soon discovered that the underpinning on a nearby trailer had been pulled loose. When he looked under that trailer, he found a green canvas bag. The contents of the bag included the following: a white, blood-stained Miami Dolphins t-shirt; several pieces of jewelry; an eight-inch long butcher knife or kitchen knife; prescription medication lying loosely in the bag; a thirty-five millimeter camera; and a black camera bag.

Detectives Pat Postiglione and Al Gray, members of the Metro Police Department assigned to investigate the homicides, found no sign of forced entry. In fact, aside from the appearance of a struggle "in and about the bed area" in Ms. Wilson's room, the crime scene looked, for the most part, "staged." For instance, Detective Gray explained that dresser drawers were pulled open, but nothing in them appeared to be disturbed; clothes were taken out of the closet and dumped onto the floor while still on their hangers; and the Christmas presents were unwrapped, but nothing appeared to have been stolen. Even the Christmas tree looked as if it were "gently pushed over," because none of the glass ornaments were broken or scattered on the floor, which would most likely have

_____

[2] On the day of his arrest, the defendant consented to a taped interrogation during which he stated that they drove to New Johnsonville the morning of December 22. However, Shawn Austin testified that they drove to White Bluff. In either case, both individuals consistently stated that it took approximately an hour and a half to reach their destination.

happened had there been a struggle. He also testified that certain rooms, which "looked like . . . very valuable area[s] of the trailer," remained undisturbed.

Both victims were found lying in their beds. Ms. Wilson was wearing a nightgown, which had been pulled above her waist. Her underwear was on the floor. There was a substantial amount of blood on her body, on the bed, and on several items in the room. Dr. Emily Ward, a pathologist with the Davidson County Medical Examiner's Office, performed autopsies on the victims. Her examination of Ms. Wilson revealed that she died from stab wounds and manual strangulation. Although her stab wounds were relatively superficial and did not pierce any vital organs, they resulted in a considerable amount of lost blood.

Mrs. Stevens was completely nude[3] and left in a "displayed" position, that is, lying on her back with her legs spread apart. She died as a result of ligature strangulation. However, there was blood on her knees, indicating that the murderer had killed Ms. Wilson first and then transferred some blood onto Mrs. Stevens.[4] There were also pornographic magazines placed around her body, as well as a photo album containing nude photos of the victim, presumably taken by the defendant during their marriage. There was no evidence of blood on these items.

Dr. Ward's examination of Mrs. Stevens revealed a small, superficial tear in her vagina. Dr. Ward testified that she thought it was a post-mortem change in the skin, which likely occurred while the body was being moved for examination. Although she conceded on cross-examination that the decedent could have been sexually assaulted after death, she did not believe this to be the case because there was no bruising, swelling, or hemorrhaging around the tear.[5]

The State introduced the testimony of Chris Holman, a friend of Milliken's, as additional evidence that the defendant hired Milliken to commit these crimes. Mr. Holman testified that around the end of October, Milliken approached him and asked him if he knew where Milliken could get a gun with a silencer. Mr. Holman told him that he "wasn't into that anymore." Three weeks prior to the murder, Milliken approached Mr. Holman again and asked if he would help murder the defendant's wife and mother-in-law. He told Mr. Holman that they would go into the house and "make it look like it was a burglary," and that he would "split even" the $5,000 he was supposed to be paid. Mr. Holman refused.

---

[3] The evidence is undisputed that Mrs. Stevens normally slept in the nude.

[4] Serology tests determined that the blood on Sandi Stevens's body was consistent with that of Myrtle Wilson.

[5] Several law enforcement officers testified that it is standard procedure that when female homicide victims are found nude with genitals "displayed," the crimes are to be initially investigated as possible sex-related crimes. Consequently, oral, anal, and vaginal swabs were taken from each victim, and a rape suspect kit was performed on Corey Milliken. Serology tests disclosed no sperm on any of the swabs taken from Ms. Wilson. However, sperm consistent with the DNA of the defendant was detected on the vaginal swab taken from Mrs. Stevens.

Lane Locke, an inmate at the West Tennessee State Penitentiary, testified that he was the defendant's cellmate at the Davidson County Criminal Justice Center for approximately three weeks. During that time, the defendant, who knew that Locke was formerly a police officer and a certified paralegal, discussed his case at great length because the defendant wanted to benefit from Locke's "legal knowledge." The defendant described his marital problems and told Locke that he did not want to go through another divorce because he had "his life in order and felt like . . . a divorce would wipe him out." The defendant also discussed his relationship with Milliken, describing him as a "big, dumb kid" who was a source of conflict between him and his wife. Based on what the defendant told him, Locke stated that it appeared that the defendant "led Corey around quite a bit."

Locke also testified that the defendant did not want to attend his wife's funeral and that he never showed any remorse or emotion over his wife's death. However, Locke testified that the defendant was very upset when he returned from his preliminary hearing. He quoted the defendant as saying, "Shawn [Austin] is just as guilty as the rest of us, and he's the only one that's gonna get away with it. I can't believe those idiots thought I was gonna pay them."

Michael Street, another inmate at the Criminal Justice Center, testified that the defendant asked him if he would "intimidate Corey Milliken or have him killed in one form or fashion," because, as the defendant said, "Corey was the only person that could put [him] in prison for the rest of [his] life." The defendant told Street that he had hired another inmate to "try to do it," but the plan fell through. Street refused the defendant's request.

The State also introduced letters between the defendant and Charles Randle, another inmate, in which the defendant offered Randle money to harm or intimidate Milliken in jail. Evidence was introduced that the defendant had obtained several hundred dollars in money orders made payable to Charles Randle.

The State also presented evidence indicating that the defendant was taking money from his mother-in-law, Myrtle Wilson. Ms. Wilson's son, Larry Wilson, testified that for over three years before the murders were committed, he had been investing and otherwise monitoring her finances totaling $83,000. A month before she was killed, his mother expressed concern that she "didn't have the funds that she thought she should." Shortly after the murders, Mr. Wilson was examining his mother's financial information, and he discovered a check written on June 10, 1997, made payable to the defendant for four thousand dollars. He explained that the check was questionable for several reasons: first, the check was printed rather than handwritten, and his mother never printed her checks; second, the printing was "way too clear" to be his mother's because she had grown "feeble" and her hand was "rather shaky" when she wrote; and finally, Ms. Wilson had recorded the amount for that check as *forty* dollars, not four thousand.

Additionally, Doris Trott, the victims' hairdresser since 1992, testified to several conversations she had with Ms. Wilson early in the fall of 1997, during which Ms. Wilson complained that the defendant never repaid her any of the money that he often borrowed. Later that

fall, Ms. Wilson told Ms. Trott that the defendant had asked her to sign a ten-thousand dollar life insurance policy, which she refused to do.

Evidence was also presented regarding the marital problems that the defendant and Mrs. Stevens were having. In Mrs. Stevens's diary, she described her unhappiness in the marriage and her increasing distrust of her husband's fidelity. Although she still loved the defendant, she wanted to "get out" of the marriage. William Byers, Sandi Stevens's ex-husband, testified that he talked to her shortly before she died, and she told him that the defendant explicitly refused to give her a divorce. She also expressed her dislike for Corey Milliken and described him as the source of many heated arguments between the defendant and herself. She wrote that he was the "wedge" driving her and the defendant apart.

The defense presented evidence of Corey Milliken's sexual infatuation with Sandi Stevens. Shawn Austin testified that his brother told him that the defendant had shown him pictures of his wife in lingerie and in the nude, and that the defendant told Milliken that she wanted to have sex with both of them at the same time.

The defense theory was that Milliken committed sexual murder as an act of aggression precipitated by an argument with his mother and step-father the night before the crimes. Milliken's step-father, Billy Stevens (unrelated to the defendant), testified that he and Milliken did argue the night before the crimes, and that at one point he "grabbed" Milliken after Milliken "got smart with his mother." Milliken ran out of the house, but had returned home by the time Mr. Stevens left for work early the next morning. Mr. Stevens also testified that he and Milliken had argued in the past, and that on several occasions Milliken had run out of the house following an argument.

As evidence that these murders involved a sexual component, the defense introduced the testimony of crime scene expert, Gregg McCrary. Mr. McCrary testified that the display of pornographic magazines around Mrs. Stevens could "best be interpreted as an attempt to further humiliate or degrade" the victim, which "goes to the motive of a sex crime." He defined a sex crime as primarily a crime of violence in which the perpetrator uses sex to punish, humiliate, and degrade the victim.

Based upon the proof as summarized above, the jury found the defendant guilty of two counts of premeditated first degree murder and one count of especially aggravated robbery.[6]

## Penalty Phase

The State first presented evidence of the defendant's conviction in 1977 for second degree murder. The State also presented as victim impact evidence the testimonies of the victims' family

---

[6] On the especially aggravated robbery conviction, the court sentenced the defendant to life imprisonment without parole as a repeat violent offender, with the sentence consecutive to both death sentences.

members, who each discussed the devastating effect of the murders of Myrtle Wilson and Sandi Stevens on their lives.

In mitigation of the sentence, the defense presented testimony from the defendant's family members, co-workers, and neighbors. The defendant was adopted into a family of five children. Chris Baumann, the defendant's sister, testified that the defendant had a good childhood and was part of a "normal family." She also testified to the defendant's close relationship with his son, John. Robert Rasmus, the defendant's foster brother, also testified to the "great family upbringing" that all five children enjoyed. He further stated that the defendant had done a wonderful job raising his son John, and that he was proud of how the defendant had turned his life around after his first conviction in 1977. On cross-examination, Mr. Rasmus admitted that the defendant had also been convicted of felony escape during his incarceration for second degree murder.

Vickie Stevens, the defendant's ex-wife, testified that the defendant was a good husband and father during most of their marriage. After the divorce, he made all of his child support payments and remained a loving and supportive father. She also expressed her wish that the defendant be spared the death penalty for the sake of their son.

Roger Cooper, the sales manager of a mobile home company, testified that he employed the defendant in 1989 for approximately one year. During that time, he knew the defendant to be a hard-working and dedicated employee, and he trusted the defendant enough to give him a key to his own home.

Several of the defendant's neighbors testified to how helpful the defendant was to others in the community. Specifically, the defendant loaned money to his neighbors, checked in on neighbors who were elderly, sick, or alone, and voluntarily fixed their trailers without requiring payment.

At the close of the proof, the jury was instructed on the following statutory aggravating circumstances for each of the two counts of murder: (1) the defendant was previously convicted of the felony of second degree murder; and (2) the defendant employed another to commit the murders of his wife and mother-in-law for the promise of remuneration. The jury was also instructed to consider all mitigating evidence, including the defendant's work history, the defendant's family history and close familial relationships, his positive role in the community, any other aspect of the defendant's background, character, or record, and any aspect of the circumstances of the offense favorable to the defendant and supported by the evidence.

The jury found that the State had proven the two statutory aggravating circumstances beyond a reasonable doubt and that these two aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. Consequently, on July 23, 1999, the defendant was sentenced to death for each of the two murder convictions. The trial court entered a judgment in accordance with the jury's verdict, and the Court of Criminal Appeals affirmed the defendant's convictions and his sentences of death.

The case was automatically docketed in this Court for review of the death sentences.[7] We requested additional briefing and argument on the following issues: (1) whether the trial court erred in limiting the testimony of defendant's crime scene expert, Gregg McCrary, to his analysis of the evidence found at the crime scene; (2) whether the trial court abused its discretion in excluding the testimony of Barry Morris, Corey Milliken's former foster parent, regarding Milliken's prior bad acts; (3) whether the trial court violated the defendant's constitutional right to present a defense by failing to apply the hearsay and other evidentiary rules in an even-handed manner; and (4) whether the death sentence is an excessive and disproportionate punishment given the nature of the defendant and the circumstances of this case.

After reviewing the record and considering the issues raised by the defendant, we find no reversible error and affirm the judgment of the trial court and of the Court of Criminal Appeals.

## I. NON-SCIENTIFIC EXPERT TESTIMONY

The defendant first contends that the trial court erred when it refused to allow crime scene investigator, Gregg McCrary, to testify to the behavior and motivation of the offender based on his analysis of the physical evidence found at the crime scene. The defense offered Mr. McCrary's testimony to prove that Milliken committed sexually motivated murder as a violent response to a fight with his mother and step-father just hours before the crime.

In a jury-out hearing, Mr. McCrary testified that he had worked as a special agent for the Federal Bureau of Investigation (FBI) for approximately twenty-five years. During that time, he took several graduate courses in criminal justice, and he received a Master's degree in Psychological Services. He served his last ten years with the FBI in the Behavioral Science Unit, investigating cases and conducting research on violent criminal behavior to improve the operational effectiveness of the law enforcement community. He received basic and advanced training in crime analysis, and he also received training in sex crimes investigations, becoming an FBI expert in this field of law enforcement. Moreover, Mr. McCrary testified that as an FBI agent, he participated in the investigation of over a thousand cases, most of which were "sexually violent" homicides. At the time of the trial, he had retired from the FBI and was currently managing his own consulting business in behavioral criminology.

Mr. McCrary had been contacted by the defense to conduct a criminal investigation of the crime scene in this case. He explained that the FBI used criminal investigative analysis to discern the probable motive of the criminal by analyzing the evidence found at the crime scene "primarily

---

[7] See Tenn. Code Ann. § 39-13-206(a)(1) (1997) ("Whenever the death penalty is imposed for first degree murder and when the judgment has become final in the trial court, the defendant shall have the right of direct appeal from the trial court to the court of criminal appeals. The affirmance of the conviction and the sentence of death shall be automatically reviewed by the Tennessee supreme court.").

from a behavioral perspective, looking at what the offender has done in the commission of the crime to understand the potential motive for the crime as well."[8]

In this case, Mr. McCrary reviewed the crime scene photos, the medical examiner's report, Mrs. Stevens's diary, and a video tape of the crime scene. However, he specifically asked not to be given any information on the suspect so as to be able to provide an objective analysis. Based on his review of this evidence, Mr. McCrary categorized the crime scene in this case as a "disorganized sexual homicide scene." He explained that in a disorganized scene,

> the victim and location are known to the offender; . . . there is minimal conversation, a minimal interpersonal conflict–contact between the victim and the offender during the course of the crime. It's usually a blitz attack[9] or a sudden violence that's used.
> The crime scene is quite sloppy and in great disarray. There is minimal use of restraints. The sexual acts tend to occur after death; so, there is post-mortem injury to the victim . . . indication of post-mortem sexual activity.
> The body is left at the death scene . . . and is typically left in view. There's a good deal of physical evidence that's–that's left at the scene. And, anytime just a weapon of opportunity that the offender uses, and by that, I mean a weapon that is contained at the scene, uses it and, then, it's not uncommon for the offender to leave that weapon either at or near–near the scene.

Mr. McCrary testified that criminals usually commit disorganized violent crimes as a result of some "precipitating stresser, [or] stressful event" in the criminal's life. Such an event invokes a lot of anger in the offender, and that anger–transferred onto the victim–triggers this violent behavior. Moreover, he stated that it was common in disorganized scenes to find evidence of post-mortem sexual activity, including insertion of a foreign object.

In contrast to his description of a disorganized crime scene, Mr. McCrary testified to the characteristics of a typical contract murder crime scene. Usually, the offender spends very little time at the crime scene. A firearm is normally the weapon of choice, and the "kills are quick [and the offender is] out of there . . . right after the murders are committed." However, he testified that the perpetrator in this case spent a fair amount of time at the crime scene "trashing" the place to make

---

[8] Mr. McCrary distinguished the use of behavioral analysis, which determines the probable motive of a known suspect, from the use of profiling, which determines the physical characteristics and personality traits of an unknown suspect.

[9] According to Mr. McCrary, a "blitz attack" is "an immediate application of an injurious physical force. . . . [T]he attack is sudden. There is no leading up to the attack." He compared this to those situations in which an argument arises between the victim and the offender that starts with pushing, shoving, slapping, and hitting, and may escalate to a homicide. In a blitz attack, however, "there is none of that antecedent behavior. It starts with the immediate attack on the victim without any–any build up or any of that antecedent behavior."

it look like a burglary or a "for profit" motive.[10]  Mr. McCrary also testified to the possibility that more than one perpetrator committed these murders based on the use of different murder weapons and the lack of blood transference on several items throughout the trailer.

On cross-examination, Mr. McCrary testified that the FBI had conducted a study to determine the accuracy rate of its crime scene analysis.  The results of that study yielded a seventy-five to eighty percent accuracy rate.  He presented as further evidence of the reliability of crime scene analysis the FBI's increased number of trained agents in this field from seven to forty. Although Mr. McCrary acknowledged that crime scene analysis "is not hard science where you can do controlled experiments and come up with ratios in all this," he said that "the proof [that] there is validation and reliability in the process is that it's being accepted.  It's being used and the demand is just outstripping our resources to provide it."

At the close of the jury-out offer of proof, the trial court found that Mr. McCrary had demonstrated expertise in his ability to analyze the evidence found at the crime scene, and therefore he was permitted to testify to the staging of the crime scene, to any omissions in the police investigation, and to the possibility that the homicides were committed by more than one offender. However, the court refused to admit any testimony indicating an interpretation of criminal behavior, including Mr. McCrary's description of the characteristics of a typical contract murder crime scene and his opinion regarding what motivated the killer in this case.  Although the court deemed such evidence to be "specialized knowledge" and a "tremendous asset as an investigation tool in law enforcement," the court determined that such evidence did not comply with Rule 702 "in terms of substantially assisting the [trier] of fact because there is no trustworthiness or reliability."  In its order denying the defendant's motion for a new trial, the trial court stated that it was not "convinced that this type of analysis has been subject to adequate objective testing, or that it is based upon longstanding, reliable, scientific principles."

The Court of Criminal Appeals affirmed the trial court's decision and held that the factors set forth in McDaniel v. CSX Transportation, Inc., 955 S.W.2d 257, 264-65 (Tenn. 1997), are applicable not only to scientific evidence, but also to "technical" or "specialized" knowledge as well. Citing the United States Supreme Court's decision in Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999) (holding that trial courts may consider the Daubert factors to determine the reliability of nonscientific expert testimony), the intermediate court concluded that despite the nonscientific evidence at issue, the trial court did not apply an incorrect legal standard by looking to McDaniel to determine the reliability of this expert testimony.  The issues now before us are whether nonscientific expert testimony must not only meet the fundamental requirement of relevance, but also the requirement of reliability, and, if so, whether or how McDaniel applies when making an assessment of reliability.

---

[10] Mr. McCrary defined "staging" as "the purposeful alteration of the crime or crime scene by the offender to provide a false motive for investigators, which will take the focus off that particular killer and onto . . . a non-existent offender."

Questions regarding the qualifications, admissibility, relevancy, and competency of expert testimony are matters left within the broad discretion of the trial court. See McDaniel, 955 S.W.2d at 263-64; State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993). On appellate review, the trial court's ruling shall not be overturned absent a finding that the trial court abused its discretion in admitting or excluding the expert testimony. Ballard, 855 S.W.2d at 562. "[A]n appellate court should find an abuse of discretion when it appears that the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997).

*Reliability Determination of Nonscientific Evidence*

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the United States Supreme court held that Federal Rule of Evidence 702 imposes a "gatekeeping" obligation on the trial court to "ensure that any and all scientific testimony . . . is not only relevant, but reliable." Id. at 589. Several years later in McDaniel v. CSX Transportation, Inc., 955 S.W.2d 257 (Tenn. 1997), this Court addressed the admissibility of scientific evidence under Tennessee Rules of Evidence 702 and 703[11] and, citing Daubert, similarly held that evidence and expert testimony regarding scientific theory must be both relevant and reliable before it could be admitted. McDaniel, 955 S.W.2d at 265. We also listed several nonexclusive factors that courts could consider in determining the reliability of scientific expert testimony, including (1) whether the scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation. Id.

The testimony at issue in this case, however, is not based on scientific theory and methodology, but rather, is based on nonscientific "specialized knowledge," that is, the expert's experience. See Simmons v. State, 797 So. 2d 1134, 1151 (Ala. Crim. App. 1999) ("Crime-scene analysis, which involves the gathering and analysis of physical evidence, is generally recognized as a body of specialized knowledge."); see also United States v. Meeks, 35 M.J. 64, 68 (C.A.A.F. 1992). The trial court correctly reasoned that such nonscientific testimony must still meet the fundamental requirements of relevance and reliability. Indeed, nothing in the language of Rules 702

---

[11] Tennessee Rule of Evidence 702 provides:

If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Tennessee Rule of Evidence 703 provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

and 703 suggests that scientific testimony should be treated any differently than expert opinions based on technical or nonscientific specialized knowledge. "If the mention of scientific knowledge suffices to mandate reliability standards for scientific testimony, a fortiori the mention of nonscientific expert knowledge should compel the courts to seek to formulate reliability standards for that type of expert evidence as well." Edward J. Imwinkelreid, The Next Step After *Daubert*: Developing a Similarly Epistemological Approach to Ensuring the Reliability of Nonscientific Expert Testimony, 15 Cardozo L. Rev. 2271, 2281 (1994).

In this case, the trial court found that Mr. McCrary's testimony failed to pass the McDaniel test of scientific reliability. The defendant argues that the trial court erred in applying McDaniel in this case because McDaniel applies only to *scientific* testimony. Mr. McCrary's testimony, on the other hand, was based on his extensive experience as a former agent with the FBI, his training in crime scene analysis, and his personal investigation of over a thousand violent crimes. Consequently, the defendant argues, such testimony, which would have substantially assisted the trier of fact to understand what motivated Milliken to commit these crimes, should have been admitted under Rule 702 simply by virtue of the witness's experience, training, and education.

We agree with the defendant's assertion that not all disciplines are amenable to empirical verification but may nevertheless substantially assist the trier of fact. Consequently, we are reluctant to measure the reliability of expert testimony that is not based on scientific methodology under a rigid application of the McDaniel factors. However, we are equally reluctant to admit nonscientific expert testimony based on an unchallenged acceptance of the expert's qualifications and an unquestioned reliance on the accuracy of the data supporting the expert's conclusions.

In resolving the evidentiary issue before us, the United States Supreme Court's recent decision in Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999), provides useful guidance. In that case, the Supreme Court was asked to determine whether a trial court "may" consider Daubert's factors when determining the admissibility of an engineering expert's testimony based on specialized knowledge. The Court first held that Daubert's "gatekeeping obligation," requiring an inquiry into both the relevance and the reliability of the evidence, applies not only to expert testimony characterized as scientific, but to all expert testimony. See Kumho Tire Co., 526 U.S. at 147. Moreover, the Court concluded that when assessing the reliability of nonscientific expert testimony, the trial court may consider the Daubert factors "where they are reasonable measures of the reliability of expert testimony." Id. at 152. However, the Court cautioned that the

> "factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." The conclusion, in our view, is that we can neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in Daubert, nor can we now do so for subsets of cases categorized by category of expert or by kind of evidence. Too much depends upon the particular circumstances of the particular case at issue.

Id. at 150 (citations omitted). The Court concluded that the trial court maintains "considerable leeway" in deciding whether to consider the specific factors in Daubert "as reasonable measures of the reliability of expert testimony." Id. at 152.

We find this analysis reasonable, and consequently, we reject the defendant's argument that McDaniel applies only to scientific testimony. Distinguishing scientific evidence from other areas of expert testimony is too difficult a determination in many instances. Consequently, to restrict McDaniel to scientific evidence would be to impose upon the trial court the undue burden of classifying the legions of expert witnesses as scientific or nonscientific. We do not believe that Rule 702 "creates a schematism that segregates expertise by type while mapping certain kinds of questions to certain kinds of experts." Kumho Tire Co., 526 U.S. at 151. Accordingly, we hold that the McDaniel factors *may* apply, subject to the discretion of the trial court, "as reasonable measures of the reliability" of all expert testimony described in Rule 702.

In properly exercising its discretion, the trial court must first make a determination that the witness is qualified by knowledge, skill, experience, training, or education to express an opinion within the limits of the expert's expertise. Tenn. R. Evid. 702. The determinative factor is whether the witness's qualifications authorize him or her to give an informed opinion *on the subject at issue*. See, e.g., United States v. Starzecpyzel, 880 F. Supp. 1027, 1043 (S.D.N.Y. 1995) (presenting as an example of unreliable and inadmissible evidence the testimony of a weekend recreational sailor professing expertise as a harbor pilot); see also Wilson v. Woods, 163 F.3d 935, 937-38 (5th Cir. 1999) (finding an expert in fire reconstruction unqualified as an expert in auto accident reconstruction).

The trial court must next ensure that the basis for the witness's opinion, *i.e.*, testing, research, studies, or experience-based observations, adequately supports that expert's conclusions. For example, in General Electric Co. v. Joiner, 522 U.S. 136 (1997), Joiner, an electrician diagnosed with small-cell lung cancer, introduced expert testimony to demonstrate that his workplace exposure to certain chemicals and other toxins contributed to his disease. The experts, in giving their opinions, cited to several studies that were either so dissimilar to the facts of the case or failed to make the requisite link between cancer and chemical exposure. The Supreme Court held that the studies relied on were an insufficient basis for the expert opinions and, therefore, the testimony was inadmissible. In so holding, the Court said,

> [N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

Id. at 146.

This "connection" between the expert's conclusion and the underlying data supporting that conclusion is of especial importance when determining the reliability of experience-based testimony,

because observations and experiences are not easily verifiable by the court. However, the court may make a finding of reliability if the expert's conclusions are sufficiently straightforward and supported by a "rational explanation which reasonable [persons] could accept as more correct than not correct." Wood v. Stihl, 705 F.2d 1101, 1107-08 (9th Cir. 1983).[12]

Consequently, when the expert's reliability is challenged, the court may consider the following nondefinitive factors: (1) the McDaniel factors, when they are reasonable measures of the reliability of expert testimony; (2) the expert's qualifications for testifying on the subject at issue; and (3) the straightforward connection between the expert's knowledge and the basis for the opinion such that no "analytical gap" exists between the data and the opinion offered. Subject to the trial court's discretion, once the evidence is admitted, "it will thereafter be tested with the crucible of vigorous cross-examination and countervailing proof." McDaniel, 955 S.W.2d at 265.

*Inadmissibility of Behavioral Crime Scene Analysis*

Turning to the facts in this case, we cannot conclude that the trial court erred in refusing to admit Mr. McCrary's expert opinion regarding the behavior of the perpetrator of these crimes. This type of crime scene analysis, developed by the FBI as a means of criminal investigation, relies on the expert's subjective judgment to draw conclusions as to the *type of individual* who committed this crime based on the physical evidence found at the crime scene. Although we do not doubt the usefulness of behavioral analysis to assist law enforcement officials in their criminal investigations, we cannot allow an individual's guilt or innocence to be determined by such "opinion evidence connected to existing data only by the *ipse dixit*" of the expert.[13] Essentially, the jury is encouraged

---

[12] The following well-known hypothetical demonstrates our point:

[I]f one wanted to prove that bumblebees always take off into the wind, a beekeeper with no scientific training at all would be an acceptable expert witness *if* a proper foundation were laid for his conclusions. The foundation would not relate to his formal training, but to his firsthand observations. In other words, the beekeeper does not know any more about flight principles than the jurors, but he has seen a lot more bumblebees than they have.

Berry v. City of Detroit, 25 F.3d 1342, 1350 (6th Cir. 1994) (emphasis in original). The basis for the beekeeper's opinion is his experience observing bees. In determining whether this expert's testimony is reliable, the trial court can look at the connection between the beekeeper's observations and his conclusions extrapolated from these observations. The conclusions should be sufficiently straightforward to assist the jury's understanding of the take-off habits of bees. "The straightforward character of the testimony is essential to its reliability because it permits the jury to understand, and thus weigh, the beekeeper's conclusion without the necessity of an explanation of the scientific principles that account for bees always taking off into the wind." J. Brook Lathram, The "Same Intellectual Rigor" Test Provides an Effective Method for Determining the Reliability of All Expert Testimony, Without Regard to Whether the Testimony Comprises "Scientific Knowledge" or "Technical or Other Specialized Knowledge", 28 U. Mem. L. Rev. 1053, 1066-67 (1998).

[13] Similarly, in State v. Roquemore, 620 N.E.2d 110, 113-14 (Ohio Ct. App. 1993), the expert witness, also a crime scene analyst, classified crime scene assessment as part of a larger "profiling" review. He described "profiling"
(continued...)

to conclude that because this crime scene has been identified by an expert to exhibit certain patterns or telltale clues consistent with previous sexual homicides triggered by "precipitating stressors," then it is more than likely that this crime was similarly motivated. Cf. State v. Ballard, 855 S.W.2d 557, 561 (Tenn. 1993) (rejecting as unreliable expert testimony concerning personality profiles of sexually abused children). Indeed, Mr. McCrary himself acknowledged that his analysis involves some degree of speculation, and he further negated the sufficiency of his own analysis when he conceded that each case is "unique" and that criminals are often driven by any number of motives.

Moreover, we find that the FBI's study revealing a seventy-five to eighty percent accuracy rate for crime scene analysis lacks sufficient trustworthiness to constitute evidence of this technique's reliability. Although the frequency with which a technique leads to accurate or erroneous results is certainly one important factor to determine reliability, equally important is the method for determining that rate of accuracy or error. In this case, there is no testimony regarding how the FBI determined the accuracy rate of this analysis. For example, was accuracy determined by confessions or convictions, or both? Even then, the absence of a confession does not indicate the offender's innocence and thus an inaccuracy in the technique. Clearly, the accuracy rate alone, without any explanation of the methodologies used in the study, is insufficient to serve as the foundation for the admission of this testimony.

Therefore, because the behavioral analysis portion of Mr. McCrary's testimony does not bear sufficient indicia of reliability to substantially assist the trier of fact, we conclude that this testimony was properly excluded.

## II. EVIDENCE OF PRIOR BAD ACTS OF A NON-PARTY WITNESS

The defendant next argues that the trial court abused its discretion when it improperly excluded the testimony of Barry Morris, Milliken's former foster parent. The defense sought to introduce this testimony to corroborate the defendant's theory that Milliken committed the murders as a violent reaction to an argument that Milliken had with his mother and step-father the night before the crimes.

---

[13] (...continued)

as

> *basically a method of examination which looks at the issue of motive.* It ties to crime scene assessment, which basically examines the evidence set forth or the evidence known, which may include the photographs, the autopsy reports, the police reports, available information, and then one analyzes that based on probability for pattern in terms of development. Is there a sequence, is there an order, is that consistent with what has generally been established as recognized patterns in crime behavior?

Id. at 114 (emphasis added). The court held that the testimony should have been excluded because, among other reasons, "there is little indication in the record that [profiles] can be said to be reliable for the purposes for which they were used by the state in the instant case." Id. (citations omitted).

Mr. Morris testified in a jury-out offer of proof that in 1996 he had been Milliken's foster parent. On several occasions during the course of that year, Milliken would argue with his mother over the telephone and then vent his frustration by throwing things and damaging furniture. Although Milliken never physically assaulted anyone, Mr. Morris stated that Milliken had warned him once or twice to be careful when he went to sleep.

The trial court rejected the proposed testimony, finding such testimony inadmissible under Tennessee Rule of Evidence 404(b) because it showed Milliken's propensity for violence after arguments with his parents.[14] The intermediate court affirmed the trial court's decision, holding that such evidence was propensity evidence prohibited by Rule 404(b) and further concluding that any connection between Milliken's violent behavior in 1995-1996 and the murders in 1997 "is simply too tenuous" and therefore, irrelevant to Milliken's motive for murdering Mrs. Stevens and Ms. Wilson.

It is well established that in a criminal trial, evidence of a *defendant's* prior misconduct is inadmissible to establish the accused's bad character or criminal propensity. See State v. Mallard, 40 S.W.3d 473, 480 (Tenn. 2001); State v. Parton, 694 S.W.2d 299, 302 (Tenn. 1985); Mays v. State, 145 Tenn. 118, 140-41, 238 S.W. 1096, 1102 (1921); see also Tenn. R. Evid. 404(b). The frequently enunciated rationale for this rule is that evidence of other crimes "may tend to confuse the jurors, predispose them to a belief in the defendant's guilt or prejudice their minds against the defendant." Sessoms v. State, 744 A.2d 9, 15 (Md. 2000) (citations omitted).

However, in this case, the evidence at issue involves previous "crimes, wrongs, or bad acts" committed by one other than the defendant. Such evidence clearly was not being offered to show that the defendant had a criminal disposition and that he could be expected to act in conformity therewith, but was instead offered by the defendant to show that Milliken committed the murders out of anger, and not because he had been hired to do so by the defendant. Because there is no risk of prejudice to the defendant, Rule 404(b) is inapplicable in this situation. Indeed, this Court recently held in State v. DuBose, "Evidence of crimes, wrongs or acts, if relevant, [is] not excluded by Rule 404(b) if [the acts] were committed by a person other than the accused." 953 S.W.2d 649, 653 (Tenn. 1997).

---

[14] Rule 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

    (1) The court upon request must hold a hearing outside the jury's presence;

    (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and

    (3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Nevertheless, while the court erred in excluding this testimony, we look at the effect of that error on the trial by evaluating that error in light of all of the other proof introduced at trial. State v. Gilliland, 22 S.W.3d 266, 274 (Tenn. 2000). "The more the proof exceeds that which is necessary to support a finding of guilt beyond a reasonable doubt, the less likely it becomes that an error affirmatively affected the outcome of the trial on its merits." Id.

The record in this case contains substantial, indeed overwhelming, evidence of the defendant's guilt. According to the State's theory, the defendant hired his eighteen year-old neighbor, Corey Milliken, to murder his wife and mother-in-law. The evidence clearly showed that the defendant was having marital problems but refused to go through another divorce. He had also been taking substantial sums of money from his mother-in-law, and he believed that he would inherit a portion of the proceeds from her life insurance policy. Several witnesses testified about the defendant's extensive planning for the commission of the murders. Shawn Austin, Milliken's brother, who had also been asked to assist in the murders but refused, testified that the defendant took Milliken on a tour of the trailer to show him what to do to make the crimes look like they were committed in furtherance of a burglary. The defendant instructed Milliken to shoot the victims, but if he could not acquire a gun, he was to use a knife from the defendant's trailer. Chris Holman, one of Milliken's friends testified that Milliken asked him if he could find a gun with a silencer; when he refused to do so, Milliken explained his purpose for the request and offered to "split even" the money if he helped murder the victims. Milliken's girlfriend also testified that the defendant offered to pay Milliken five thousand dollars, and she stated that she was supposed to provide Milliken's alibi once the murders were completed. Finally, Lane Locke, the defendant's former cellmate, testified that the defendant frequently discussed his case with him, and he quoted the defendant as saying, "I can't believe those idiots thought I was going to pay them." The defendant presented no evidence refuting these allegations.

We have long recognized that "'the line between harmless and prejudicial error is in direct proportion to the degree . . . by which proof exceeds the standard required to convict . . . .'" Spicer v. State, 12 S.W.3d 438, 447-48 (Tenn. 2000) (citation omitted). After considering the overwhelming evidence of the defendant's participation in these murders, we conclude that the exclusion of Barry Morris's testimony regarding Milliken's tendency to become violent after arguing with his mother did not affirmatively affect the outcome of the trial on its merits. Accordingly, the error is harmless.

## III.  APPLICATION OF EVIDENTIARY RULES

The defendant next argues that the trial court applied hearsay and other evidentiary rules in an unfair and biased manner, which thereby denied the defendant his due process right to present a

complete defense at trial.[15]  He points to six specific instances of alleged judicial misconduct.  We shall consider each incident separately.

*Testimony of Doris Trott*

The defendant's first perceived trial court bias in favor of the State involves the testimony of the State's witness Doris Trott, Ms. Wilson's hairdresser.  The defendant argues that the State was allowed to elicit "state of mind" hearsay testimony, Tenn. R. Evid. 803(3), over the defendant's objection, but when the defendant sought to elicit similar testimony on cross-examination, the trial court unfairly sustained the State's hearsay objection.[16]

The defendant sought to elicit testimony from this witness regarding whether Ms. Wilson had ever expressed concern about Corey Milliken making sexual comments and gestures in the presence of Ms. Wilson and her daughter, Mrs. Stevens.  The State raised a hearsay objection.  During a bench conference, the defendant argued that such testimony should be allowed to show Milliken's intent to commit rape.

We disagree with the defendant's argument that the trial court's ruling was improper or one-sided.  After careful review of the record, we find that the trial court gave defense counsel numerous opportunities during his offer of proof to demonstrate the admissibility of the excluded evidence.  For instance, when counsel argued that Ms. Wilson's statement went "to the theory of the crime . . . Milliken's intent to rape these two women," the trial court said, "[T]he hearsay exception is the declarant's intent, or motive, [Tenn. R. Evid. 803(3)], not Corey Milliken's.  I'm trying to follow your reasoning for it coming in."  Defense counsel concluded the conference by insisting that

---

[15]  The State contends that this issue is waived because the defendant did not include this claim in his motion for a new trial.  Although we agree with the State, in the interest of "enhanc[ing] . . . the search for justice," Johnson v. Hardin, 926 S.W.2d 236, 239 (Tenn. 1996), we elect to decide this issue on the merits pursuant to Tennessee Rule of Appellate Procedure 2:

> For good cause, including the interest of expediting decision upon any matter, the Supreme Court . . . may suspend the requirements or provisions of any of these rules in a particular case on motion of a party or on its motion and may order proceedings in accordance with its discretion, except that this rule shall not permit the extension of time for filing a notice of appeal prescribed in Rule 4, an application for permission to appeal prescribed in Rule 11, or a petition for review prescribed in Rule 12.

[16]  We reiterate the well-established rule that a trial court ruling excluding evidence may not be challenged on appeal "unless a substantial right of the party is affected" and an offer of proof is contained in the record.  Tenn. R. Evid. 103(a)(2).  The purpose of an offer is two-fold:  First, the proof must demonstrate the substance, purpose, and relevance of the excluded evidence to "inform[] the trial court what the party intends to prove so that the court may rule intelligently."  Alley v. State, 882 S.W.2d 810, 815 (Tenn. Crim. App. 1994).  Second, an offer "creates a record so that an appellate court can determine whether there was reversible error in excluding the evidence."  Id.; see also State v. Goad, 707 S.W.2d 846, 852-53 (Tenn. 1986) ("When [excluded evidence] consists of oral testimony, it is essential that a proper offer of proof be made in order that the appellate court can determine whether or not exclusion was reversible.").

"it's a hearsay exception cause it shows the intent of Corey Milliken when he went in there . . .was to rape these women." Clearly, the defendant sought to introduce this evidence not to prove Myrtle Wilson's state of mind, but Corey Milliken's state of mind. This testimony does not fit within a hearsay exception and was properly excluded at trial. Consequently, the hearsay objection was correctly sustained.

*Excluded Testimony Indicating Milliken's Independent Motive for Murder*

The defendant next complains that the trial court acted unfairly in prohibiting the defendant from eliciting statements on cross-examination that tended to show Milliken's independent motive for committing murder. First, the defendant suggests that the trial court erred in refusing to allow the cross-examination of Shawn Austin regarding Milliken's alleged sexual comments that purportedly resulted in his being requested to leave the defendant's trailer. The trial court sustained the State's hearsay objection after the defendant simply argued that this testimony should be admitted to show Milliken's sexual infatuation with Sandi Stevens. We can discern no appropriate hearsay exception supporting the admission of this testimony. Moreover, the defendant had previously been allowed to elicit Austin's knowledge of his brother's sexual infatuation with Mrs. Stevens over the State's objection. Tenn. R. Evid. 403. Therefore, the defendant has failed to show how the refusal to permit Shawn Austin to answer this question constituted unfair prejudice, and therefore, we find this claim to be without merit.

Second, the defendant argues that the trial court improperly prohibited Ms. Suttle, the defendant's girlfriend, from testifying that Milliken did not tell her whether he sexually assaulted the victims when he described how he killed them. However, our review of the record indicates otherwise. Indeed, the defendant was able to elicit, without objection, Ms. Suttle's testimony that Milliken had neither expressed a desire to rape the victims in this case nor described any acts of sexual assault after the murders had been committed. The State objected only after the defendant insisted that Milliken "left [the sexual assaults] out, didn't he?" The question clearly required the witness to assume facts not in evidence.

In Bearden v. Memphis Dinettes, Inc., 690 S.W.2d 862, 868 (Tenn. 1984), this Court stated that "hypothetical questions are improper and of no value when they assume facts not supported by the evidence at trial." Here, the defendant has failed to point out any evidence from the record that would support the assumption that Milliken either raped the victims or sexually assaulted them, and we have found none. Accordingly, the objection was correctly sustained.

Third, the defendant complains that Shawn Austin should have been allowed to testify, over the State's hearsay objection, that Milliken "lied to make himself a bigger man." There is no evidence that Austin had personal knowledge of his brother's reasons for lying. A review of the record fails to reveal whether Austin's knowledge on the subject, if any, was based on his personal knowledge or speculation. Accordingly, his testimony was properly excluded under Tennessee Rule of Evidence 602.

Finally, the defendant argues that he was improperly precluded from questioning Detective Postiglione regarding his knowledge of whether Sandi Stevens had "any disputes, or arguments" with Milliken. The State objected to this evidence as hearsay. The defendant presented no offer of proof demonstrating that the answer to this question would lead to relevant or admissible evidence. Furthermore, throughout the trial, overwhelming evidence was presented to prove Mrs. Stevens's dislike for Corey Milliken, including excerpts from her own diary, and this evidence would have been cumulative. Tenn. R. Evid. 403. Consequently, the defendant has not demonstrated how the trial court's ruling constituted unfair prejudice, and thus, this claim is without merit.

### Detective Gray's Reliance on Milliken's Statements

During cross-examination, the defendant questioned the officer about why he failed to pursue certain investigative procedures. Detective Gray stated that he conducted his investigation of the crimes based on Milliken's description of how the murders were committed. He testified that he did not need to pursue certain investigative procedures because Milliken told him about "things in that trailer only the person that did it could know." To rebut the inference of Milliken's credibility and truthfulness, defense counsel argues before this Court that Stevens should have been allowed to introduce Milliken's inconsistent confessions. During his investigation, Detective Gray obtained two confessions from Milliken regarding the crimes. In his first confession, Milliken stated that he had killed the victims because he was angry after arguing with his mother and step-father. Later, he said that the defendant had hired him to kill Ms. Wilson and Mrs. Stevens, an act for which he was to receive five thousand dollars.

A close reading of the record, however, fails to reflect that Stevens actually attempted to introduce the inconsistent confessions. The trial court, therefore, was never given the opportunity to rule on their admissibility. Although we have elected to consider issues not included in the defendant's motion for new trial, this specific complaint of an unfair and biased trial court evidentiary ruling is clearly not properly before this Court because it was never raised in the trial court.

## IV. WHETHER THE CUMULATIVE EFFECT OF ALL ERRORS VIOLATES THE DEFENDANT'S CONSTITUTIONAL RIGHT TO PRESENT A DEFENSE

The Defendant contends that the cumulative effect of all errors alleged both at trial and at sentencing violates his constitutional rights. However, all errors with respect to the defendant's prior issues have been deemed harmless, and, after careful consideration, we hold that, separately or in the aggregate, these errors did not prejudice the defendant. Consequently, this issue is without merit.

## V. SUFFICIENCY OF EVIDENCE SUPPORTING AGGRAVATING AND MITIGATING CIRCUMSTANCES

Pursuant to Tennessee Code Annotated section 39-13-206(c)(1), we now determine whether the evidence is sufficient to support the two aggravating circumstances found by the jury and

whether these aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt. In determining whether the evidence supports the application of the aggravating circumstances, the proper standard to consider is whether, after reviewing the evidence in a light most favorable to the State, a rational trier of fact could have found the existence of the aggravating circumstances beyond a reasonable doubt. See, e.g., State v. Henderson, 24 S.W.3d 307, 313 (Tenn. 2000).

First, the proof supports application of the (i)(2) aggravating circumstance, that the defendant had previously been convicted of second degree murder, Tenn. Code Ann. § 39-13-204(i)(2). During the penalty phase of the trial, Lieutenant William M. Bowers of the Montgomery County sheriff's office testified that in 1977, he worked as an agent with the Tennessee Bureau of Investigation and was the prosecuting witness and investigator in the trial against the defendant. He further testified that on May 16, 1977, the defendant was convicted of second degree murder. A copy of the judgment in that case was then placed into evidence. As the evidence of the defendant's former conviction is undisputed, we conclude that a rational trier of fact could have found the existence of this aggravating circumstance beyond a reasonable doubt.

The jury also found the evidence sufficient to support the aggravating circumstance that the defendant hired Corey Milliken to murder Sandi Stevens and Myrtle Wilson for the promise of remuneration, Tenn. Code Ann. § 39-13-204(i)(4). The evidence in this case is that the defendant was having marital problems, but did not want to endure the financial hardship of another divorce. Milliken's girlfriend and brother testified that the defendant promised to pay Milliken five thousand dollars to kill the defendant's wife and mother-in-law. To corroborate the proof that this was a murder for hire, the State also introduced evidence that the defendant offered to pay several prison inmates to kill Corey Milliken, and did arrange to have money sent to a fellow prison inmate for this purpose. Viewed in a light most favorable to the State, we conclude that a rational trier of fact could have concluded that this aggravating circumstance was proven beyond a reasonable doubt.

Moreover, the evidence is sufficient to support the jury's finding that the statutory aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. In mitigation of his offense, the defendant presented evidence of his good relationship with his young son, his reputation as a hard-working individual, his concern for the welfare of his neighbors and friends, and his charity on behalf of those less fortunate than himself. There is no evidence that the defendant suffered from a mental defect or suffered abuse as a child. Based on our extensive review of the record, we conclude that the evidence is sufficient to support a finding that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt.

## VI. PROPORTIONALITY REVIEW

Finally, we conduct statutory comparative proportionality review as a final safeguard to determine whether the defendant's sentence of death for first degree murder is "disproportionate to the sentences imposed for similar crimes and similar defendants." State v. Bland, 958 S.W.2d 651, 664 (Tenn. 1997); see also Tenn. Code Ann. § 39-13-206(c)(1)(D). Our function in performing this

review is to ensure that the death penalty is not applied arbitrarily or capriciously, but is instead applied consistently with other cases in which capitally-sentenced defendants were convicted of the same or similar crimes. Bland, 958 S.W.2d at 664. In conducting this analysis, we look at the facts and circumstances of the crime, the characteristics of the defendant, and the aggravating and mitigating circumstances involved, and we compare this case with other cases in which the defendants were convicted of the same or similar crimes. See State v. Godsey, 60 S.W.3d 759, 782 (Tenn. 2001). Included in this pool of similar cases are only those first degree murder cases in which "the State seeks the death penalty, a capital sentencing hearing is held, and the sentencing jury determines whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death, regardless of the sentence actually imposed." Id. at 783. Because no two cases involve identical circumstances, our objective is not to "search for proof that a defendant's death sentence is perfectly symmetrical, but to identify and to invalidate the aberrant death sentence." Bland, 958 S.W.2d at 665. If the case is "plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed," the sentence of death is disproportionate. Id. at 665. Recently, in State v. Godsey, this Court found the sentence of death disproportionate to the penalty imposed in similar cases and thus modified the sentence to life imprisonment without the possibility of parole. 60 S.W.3d at 793.

In conducting our review, we look to numerous factors relevant to the process of identifying and comparing similar cases, which include the following: (1) the means of death; (2) the manner of death (e.g., violent or torturous); (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victim's circumstances including age, race, and physical and mental conditions; and the victim's treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on nondecedent victims. Bland, 958 S.W.2d at 667. Moreover, we have identified several nonexclusive factors relevant to the comparison of the characteristics of defendants: (1) the defendant's prior criminal record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional, or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse or lack thereof; (7) the defendant's knowledge of the helplessness of the victim(s); and (8) the defendant's capacity for rehabilitation. Id.

Applying these factors, we note that the evidence in this case establishes that seventy-five year-old Myrtle Wilson was stabbed repeatedly and manually strangled. Sandi Stevens, the defendant's wife, was strangled with an electric cord. There is no evidence of provocation; indeed, the evidence indicates that both women were asleep in their beds at the time Corey Milliken murdered them. The evidence indicates that the defendant was motivated, at least in part, to kill his wife in order to get out of a troubled marriage without having to undergo the trouble and expense of a divorce. Moreover, the evidence indicates that the defendant believed that he would inherit the proceeds of his mother-in-law's life insurance policy. For several weeks, the defendant planned how the victims would be killed, how to dispose of the evidence, and what alibis each participant would have. For instance, he took Milliken on a walk-through of the trailer to show him what items to "trash," what items to "steal," and what items to leave untouched. He also told him where to dispose

of the murder weapon, where to get rid of the stolen jewelry, and where to go after the murders were completed. Finally, he established an alibi for himself by ensuring that he would be miles away at a jobsite with his young son and Shawn Austin.

The defendant, a middle-aged, high school educated Caucasian male, has previous convictions for second degree murder and felony escape. After being released from prison, he worked primarily as an independent contractor to repair mobile homes. When he was taken in for questioning, he cooperated with authorities by giving a taped statement, but he has consistently refused to admit any involvement in the murders of his wife and mother-in-law. Furthermore, the record indicates that he showed little sign of remorse, and he never requested to be allowed to attend his own wife's funeral. However, he sent many letters to his ex-wife asking if they could get back together as a couple. The proof also demonstrates that the defendant tried to hire several other inmates whom he befriended to kill Corey Milliken, thereby indicating very little potential for rehabilitation.

This Court has upheld the death penalty in several first degree murder cases involving "murders for hire." In State v. Porterfield, 746 S.W.2d 441 (Tenn. 1988), the defendants, Gail Owens–the victim's wife–and Sidney Porterfield were each convicted of first degree murder and sentenced to death. Mrs. Owens had hired Porterfield to kill the victim because she, like the defendant in this case, wanted to get out of a bad marriage. She had previously offered between five and ten thousand dollars to three other men to kill her husband, but she ultimately hired Porterfield and promised to pay him seventeen thousand dollars. Consequently, one Sunday, while the victim was alone in his house, Porterfield entered the house through the back door, which he found partially open, and he bludgeoned the victim to death with a tire iron. The jury found that the (i)(4) and (i)(5) aggravating circumstances had been proven beyond a reasonable doubt with respect to both defendants, as well as the (i)(2) aggravating circumstance with respect to Porterfield. On appeal, this Court affirmed the convictions and the sentences. Id. at 452.

In State v. Stephenson, 878 S.W.2d 530 (Tenn. 1994), the defendant, who had been having an affair, had on several occasions offered to some of his acquaintances five thousand dollars from the proceeds of a life insurance policy on his wife if they would kill her. He was afraid that she was going to divorce him and "take everything." Ralph Thompson agreed to do so and shot the victim through the windshield of her car with a high powered rifle at close range. The defendant was convicted of premeditated first degree murder and conspiracy to commit murder. The jury found beyond a reasonable doubt the existence of the (i)(4) aggravating circumstance and, finding that it outweighed any mitigating circumstances, subsequently sentenced the defendant to death.[17]

---

[17] This Court affirmed the convictions, but remanded for resentencing due to a fundamental instructional error that occurred during the sentencing phase of the trial. Id. at 556. On remand, the parties reached an agreement on which the sentence was reduced to life without parole. Recently, this Court reversed the dismissal of the defendant's petition for habeas corpus relief and remanded the case, finding the "life without parole" sentence illegal and void because it was not a legal sentencing option at the time of the offense. See Stephenson v. Carlton, 28 S.W.3d 910, 912 (Tenn.
(continued...)

In State v. Hutchison, 898 S.W.2d 161 (Tenn. 1994), the defendant bought a large insurance policy on the victim's life, intending to hire others to kill the victim in order to collect the proceeds. The defendant eventually hired someone to lure the victim on a fishing trip and then drown him. The jury found the defendant guilty of premeditated first degree murder, and it sentenced the defendant to death after finding the (i)(4) aggravating circumstance beyond a reasonable doubt. On appeal, this Court affirmed the conviction and the sentence. Id. at 175.

In State v. Coker, 746 S.W.2d 167 (Tenn. 1987), the defendant had been having an affair with his former mother-in-law. For several months, he had suggested several possible methods for how to "get[] rid of her husband." Finally, he requested five thousand dollars to hire someone to shoot her blind husband, and she agreed. The jury found the defendant guilty of first degree murder and sentenced him to death after finding the (i)(2) and (i)(4) aggravating circumstances beyond a reasonable doubt. The defendant subsequently petitioned for post-conviction relief, alleging ineffective assistance of counsel. Post-conviction relief was granted as to his sentence, and in a resentencing hearing, he was sentenced to life imprisonment. See Coker v. State, No. 01C01-9804-CC-00152 (Tenn. Crim. App. 1999).

In State v. Austin, 618 S.W.2d 738 (Tenn. 1981), the defendant and several of his employees were served with arrest warrants for conducting illegal gambling at the defendant's place of business. The victim, a reserve deputy sheriff working undercover for the police department, recorded numerous incidents of illegal gambling activity and, as a result of his testimony, the indictments and arrest warrants were obtained. After this incident, the defendant had been heard on several occasions to express his desire to see the victim dead. Soon thereafter, he hired an escaped convict to shoot the victim at the auto repair shop where he worked. The jury found that the evidence established the (i)(4) aggravating circumstance and that this aggravator outweighed any mitigating circumstances. Consequently, the jury imposed the death penalty. However, the defendant's sentence was vacated in a habeas corpus proceeding, see Austin v. Bell, 938 F. Supp. 1308 (M.D. Tenn. 1996). At the defendant's resentencing trial, mitigating evidence portrayed the defendant as a kind, caring, deeply respected individual, and a model prisoner. Despite this evidence, the jury again imposed a sentence of death, which was upheld by the Court of Criminal Appeals in State v. Austin, No. W1999-00281-CCA-R3-DD (Tenn. Crim. App. 2001).

Moreover, we have upheld the death sentence based on the sole aggravating circumstance of a prior violent felony conviction, Tenn. Code Ann. § 39-13-204 (i)(2), in the following cases: State v. Chalmers, 28 S.W.3d 913 (Tenn. 2000); State v. Smith, 993 S.W.2d 6 (Tenn. 1999); State v. Boyd, 959 S.W.2d 557 (Tenn. 1998); State v. Nichols, 877 S.W.2d 722 (Tenn. 1994); State v. Adkins, 725 S.W.2d 660 (Tenn. 1987); State v. Goad, 707 S.W.2d 846 (Tenn. 1986).

---

[17] (...continued)
2000).

Even where the death penalty is not imposed in cases involving circumstances similar to those of the offense in this case, the defendant's death sentence is not disproportionate if this Court can ascertain some basis for the imposition of the lesser sentence. See, e.g., State v. Hall, 958 S.W.2d 679, 699 (Tenn. 1997). For instance, in State v. Mosher, 755 S.W.2d 464 (Tenn. Crim. App. 1988), the defendant hired two men to murder her husband. The jury sentenced her to life imprisonment. However, the trial judge noted that the "passionate plea by the defendant's young daughter" probably resulted in her receiving a life sentence.

The defendant in State v. Teresa M. King, 01C01-9204-CR-00146 (Tenn. Crim. App. filed at Nashville, April 29, 1993), was also sentenced to life imprisonment after being convicted for first degree murder. The defendant in this case, who was involved in an extramarital affair, took out a life insurance policy on her husband several months prior to the murder. Her boyfriend knew of this fifty thousand dollar policy, and he subsequently made arrangements for the defendant's husband to be killed. Unlike the case currently before us, in King, the defendant acted under the instruction of her boyfriend. Indeed, it appears that her boyfriend hired himself to kill the victim, planned the murder, and demanded payment for it later. In contrast, the defendant in this case painstakingly planned every detail of the murder and took every measure to walk Milliken through each step of the plan. He constructed alibis for himself and Milliken, and he even instructed both brothers on how to act should they be interrogated by the police. Nevertheless, even if this case could not be distinguished, "the isolated decision of a jury to afford mercy does not render a death sentence disproportionate." State v. Keen, 31 S.W.3d 196, 222 (Tenn. 2000).

Accordingly, we have identified cases involving circumstances similar to the crime in this case, i.e., extreme premeditation, marital difficulties, life insurance proceeds, and the defendant's procurement of another to physically kill the victim. Based on our review of these cases in which the death penalty was upheld, we conclude that the death sentence imposed for the premeditated murder of Sandi Stevens and Myrtle Wilson was neither disproportionate to the death penalty imposed in similar cases, nor arbitrarily applied.

## CONCLUSION

In conclusion, after a thorough review of the record and relevant legal authorities, based on the facts and circumstances of this case, we have determined that the defendant's allegations of error are without merit. The expert testimony regarding behavioral criminal analysis was properly excluded as being unreliable; the exclusion of the prior bad acts of a nonparty witness, although admissible under State v. DuBose, constituted harmless error in light of the overwhelming evidence supporting a verdict of guilt beyond a reasonable doubt; and there is no evidence that the trial court applied the evidentiary rules in a biased and arbitrary manner. Moreover, the evidence is sufficient to support the jury's finding of two aggravating circumstances beyond a reasonable doubt, and its finding that the aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt. With respect to issues not specifically addressed in this opinion, we agree with and affirm the decision of the Court of Criminal Appeals, authored by Judge David H. Welles and

joined by Judges Norma McGee Ogle and Alan E. Glenn. Relevant portions of that opinion are attached as an appendix.

Therefore, we hold that the sentence of death was neither disproportionate, nor arbitrarily applied. The conviction and sentence of William Richard Stevens is affirmed and the sentence shall be carried out on the 13th day of September, 2002, unless otherwise ordered by this Court or proper authority. As the record reflects that the defendant is indigent, costs of this appeal are assessed against the State of Tennessee.

_____
WILLIAM M. BARKER, JUSTICE

APPENDIX

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
April 24, 2001 Session

## STATE OF TENNESSEE v. WILLIAM R. STEVENS

### Appeal from the Criminal Court for Davidson County
### No. 98-A-825    Steve Dozier, Judge

---

### No. M1999-02067-CCA-R3-DD - Filed May 30, 2001

---

### INTRODUCTORY PARAGRAPH  [OMITTED]

### Tenn. Code Ann. § 39-13-206 Death Penalty Appeal; Judgment of the Criminal Court Affirmed

DAVID H. WELLES, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Brock Mehler and Michie Gibson, Jr., Nashville, Tennessee, for the appellant, William R. Stevens.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Jennifer Smith, Assistant Attorney General; Victor S. Johnson, District Attorney General; and Tom Thurman, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The Defendant was convicted of two counts of first degree premeditated murder for the double murder of his wife, Sandi Stevens, and his mother-in-law, Myrtle Wilson. He was also convicted of especially aggravated robbery of Sandi Stevens, arising out of the same occurrence. Both Sandi Stevens and Myrtle Wilson were found dead in their home in their respective bedrooms on December 22, 1997. Sandi Stevens was found laying on her bed nude, with pornographic magazines around her head and a photo album containing nude photographs of her on the bed. Myrtle Wilson was also found laying on her bed; her nightgown had been pulled up and her underwear was on the floor. The medical examiner determined that Myrtle Wilson died from stab wounds and manual strangulation, and Sandi Stevens died from ligature strangulation. Several items of Sandi Stevens' were taken from the trailer, giving rise to the robbery charge. The Defendant's

-28-

convictions for these crimes were based on the theory of criminal responsibility for the actions of another. The State's proof at trial established that the Defendant hired his eighteen-year-old neighbor and employee, Corey Milliken, to kill his wife and mother-in-law and to make it look like a robbery. The Defendant's theory was that Corey Milliken fabricated a "murder for hire fantasy" and that he killed Sandi Stevens and Myrtle Wilson in the perpetration of a sexual assault.

## FACTUAL BACKGROUND  [OMITTED]

## 1.  TESTIMONY OF GREGG MCCRARY  [OMITTED]

## 2.  TESTIMONY REGARDING INDEPENDENT MOTIVE  [OMITTED]

## 3.  REDACTED VERSION OF SANDI STEVENS' DIARY

The Defendant argues that the trial court erred by admitting a redacted version of Sandi Stevens' diary. The diary was admitted pursuant to Tennessee Rule of Evidence 803(3), which provides a hearsay exception for statements of a declarant's "then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)." In the diary, Sandi Stevens made statements concerning her unhappiness with her marriage and her life. She was upset about the physical and mental effects of menopause and the Defendant's lack of understanding of her condition. She made references to multiple arguments that she and the Defendant had, and she stated that she was considering leaving the marriage. The trial court admitted the diary to rebut the Defendant's statements that there were no problems in their marriage. On appeal, the Defendant does not argue that the statements made in the diary do not fall within the "state of mind" exception to the hearsay rule, but instead asserts that the diary was not relevant, and even if the diary was relevant, its probative value was substantially outweighed by the danger of unfair prejudice. He also contends that the diary was cumulative of other testimony concerning the Defendant's marriage to Ms. Stevens.

A trial court's decision to admit evidence based on its relevance will not be reversed absent an abuse of discretion in admitting the evidence. Gilliland, 22 S.W.3d at 270. As previously stated, relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Our supreme court has previously held that statements made by a victim expressing her fear of the defendant during the period of their separation were relevant to rebut the defendant's assertions that he and the victim were reconciling. See State v. Smith, 868 S.W.2d 561, 573 (Tenn. 1993). Similarly, this Court has found that a victim's statements that her husband had abused her and threatened to kill her were relevant to rebut the defendant's assertion in opening statement that he and the victim "had a good marriage and a happy marriage." See State v. John Parker Roe, No. 02C01-9702-CR-00054, 1998 WL 7107, at *10 (Tenn. Crim. App., Jackson, Jan. 12, 1998) perm. app. denied (Tenn. Jan. 4, 1999).

The status of the Defendant's relationship with Sandi Stevens became an issue in this case when Shawn Austin testified that the Defendant wanted to kill his wife and mother-in-law so that he would no longer have to pay their bills and listen to their complaints and because it would be easier to kill them than go through another divorce. Then, in the statement he gave to the police, the Defendant claimed that he cared "very deeply about [his] mother in law" and that he "love[d] [his] wife." He asserted that he and Ms. Stevens did not have any problems in their marriage. Although he said that Ms. Stevens was always jealous and that she thought he cheated on her, the Defendant maintained, "It's always been that way," and he asserted that it was not a problem in their marriage. Thus, we agree with the trial court that Sandi Stevens' statements concerning fights she had with the Defendant, unhappiness with her marriage, and thoughts of leaving the Defendant were relevant to rebut the Defendant's assertion that there were no problems in their marriage.

Next, the Defendant asserts that the probative value of the diary was outweighed by the danger of unfair prejudice. Under our Rules of Evidence, even relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. While we agree with the Defendant that Ms. Stevens' emotional statements concerning her life and the problems in her marriage were prejudicial to the Defendant, we do not believe that they were unfairly prejudicial. The Defendant claimed that there were no problems in the marriage, making Ms. Stevens' own statements about the marriage the most probative evidence available to rebut the Defendant's claims. Moreover, we cannot agree that the diary should have been excluded because it was cumulative to other testimony concerning the status of the Defendant's marriage. The State had the burden of proving beyond a reasonable doubt that the Defendant was criminally responsible for the murders of Sandi Stevens and Myrtle Wilson, and the diary was the best evidence available to the State to show that there were problems in the marriage, supporting the State's theory of motive. In essence, the probative value of the diary was not substantially outweighed by the danger of unfair prejudice.

Finally, the Defendant argues that the trial court should have admitted the entire diary rather than admitting a redacted version, so that the jury could get a complete picture of Sandi Stevens' emotional state. At trial, when the trial court indicated that it would admit portions of the diary but redact the portions it found to be irrelevant or prejudicial, the Defendant requested that the entire diary be admitted into evidence. The parties then went through various discussions about what would and would not be admitted, and the trial court ultimately admitted a partially redacted version. After looking at the redacted portions of the diary, we cannot say that the trial court abused its discretion by redacting the diary. The redacted portions concerned statements about the Defendant being "different" from the rest of society, statements about the Defendant lying to Ms. Stevens and flirting with other women, statements about Ms. Stevens' negative view of men in general, and statements about Ms. Stevens' negative feelings about herself. We agree with the court that these statements were either irrelevant or prejudicial to the Defendant.

However, it does appear that the trial court inadvertently redacted a portion of the diary concerning Ms. Stevens' feelings toward Corey Milliken. At the request of the Defendant, the trial

court admitted portions of the diary containing statements of Ms. Stevens' dislike of Corey Milliken and of the fights she had with the Defendant about Mr. Milliken. Although it is unclear from the record what actually transpired, it appears that the trial court intended to admit all the statements regarding Corey Milliken, but the following statement was omitted:

> And the way he (Cory) glares at me! Such hatred! He's such a sick, troubled 18 yr. old! I once tried to understand him & help him as Bill is doing but eventually gave up simply because he doesn't want to be helped. Doesn't want to make the effort because that takes <u>work</u>! Constantly skips school. Last week dropped out! I <u>can't</u> tolerate him anymore!

Notwithstanding, we conclude that the omission of this statement, if error, was harmless. The trial court did admit the following excerpt of Ms. Stevens' diary, which depicts her feelings toward Mr. Milliken:

> Had a big fight late last night about Cory again! Bill continues to stick up for him & I continue to dislike him more every day! I'm seriously considering leaving. Things have gotten so bad it seems Bill & I argue about him constantly. I can see a time coming when the wedge he's (Cory) driven between us will tear us apart. Cory Milliken is bad news! I'm sure he would be quite happy to move in if he can get me out. He's such a prick. No one in this world stupider or more untrustworthy! He's proven that time & time again.

An error will not be grounds for reversal unless it affirmatively appears to have affected the result of the trial on the merits. See Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b). In light of the other evidence concerning the relationship between Corey Milliken and Sandi Stevens, we cannot say that this omission would have affected the result of the trial on the merits.

## 4. RULINGS ON HEARSAY AND OTHER EVIDENTIARY MATTERS [OMITTED]

## 5. COREY MILLIKEN'S STATEMENTS TO SARAH SUTTLE

Next, the Defendant claims that the trial court erred by failing to exclude the statements Corey Milliken made to his girlfriend, Sarah Suttle, because those statements failed to qualify as statements of a co-conspirator, which would have been excepted from the hearsay rule. See Tenn. R. Evid. 803(1.2). Specifically, the Defendant asserts that those statements were made in "casual conversation" and thus did nothing to further the alleged conspiracy in any way.

The Defendant correctly asserts that Sarah Suttle was permitted to testify in detail to the statements made by Corey Milliken regarding the murders. However, the Defendant made no objection to the testimony at trial. In fact, prior to calling Sarah Suttle as a witness, the State informed the trial court that it intended to question Ms. Suttle about statements made by Mr. Milliken in furtherance of the conspiracy. At that time, the Defendant stated that he had no objection to the testimony, as evidenced by the following colloquy:

> MR. GIBSON [Defense counsel]: I'm not trying to keep out Shawn Austin's and Sara Suttle's testimony anyway. I –
>
> GENERAL THURMAN [Prosecutor]: If they don't have any objection, then that's fine. . . .
>
> THE COURT: Well, I mean, the issue, Mr. Gibson, is [--] General Thurman is attempting to forewarn, or bring up so we won't have to take so many breaks is, are you saying you're not opposed to their testimony; but, if their testimony [--] are you saying that if their testimony consists of statements made by Corey Milliken about this alleged plan, then you're not opposed to that?
>
> MR. GIBSON: No, Your Honor, I'm not.

At no point during Ms. Suttle's testimony did the Defendant object to any hearsay statements made by Corey Milliken.

In State v. Smith, 24 S.W.3d 274 (Tenn. 2000), our supreme court stated, "When a party does not object to the admissibility of evidence, . . . the evidence becomes admissible notwithstanding any other Rule of Evidence to the contrary, and the jury may consider that evidence for its 'natural probative effects as if it were in law admissible.'" Id. at 280 (quoting State v. Harrington, 627 S.W.2d 345, 348 (Tenn. 1981)). Moreover, when a party decides to forgo objection to the admissibility of evidence as a deliberate, tactical decision, this Court may not even consider whether the admission of the evidence was plain error. See id. at 283-84. Here, when the State informed the Defendant and the court that hearsay statements of Corey Milliken would be introduced, the Defendant indicated that he had no objection to that testimony. Accordingly, we find that he has waived consideration of whether the statements were admissible as an exception to the hearsay rule by failing to object to the statements at trial. See id. at 280; Tenn. R. App. P. 36(a).

## 6. CUMULATIVE EFFECT OF ERRORS [OMITTED]

## 7. INSTRUCTING JURY THAT IT MUST UNANIMOUSLY AGREE

The Defendant asserts that the trial court erred by instructing the jury that it must unanimously agree that the aggravating circumstances do not outweigh the mitigating circumstances in order to impose a life sentence, while prohibiting an instruction on the effect of a non-unanimous verdict. The trial court's instruction followed the mandates of Tennessee Code Annotated section 39-13-204(f)(1) and (h), but the Defendant argues that the statute violates the Eighth and Fourteenth Amendments to the United States Constitution in that it is misleading and coercive and it causes the jury to arbitrarily arrive at a unanimous verdict in order to avoid the imagined adverse consequences of a failure to agree on punishment.

This argument has been previously rejected by our supreme court. See State v. Vann, 976 S.W.2d 93, 118 (Tenn. 1998); State v. Smith, 893 S.W.2d 908, 926 (Tenn. 1994). Thus, we find no error.

## 8. APPLICATION OF AGGRAVATING CIRCUMSTANCE

The Defendant next argues that the application of the Tennessee Code Annotated section 39-13-204(i)(4) aggravating circumstance to his case duplicates an element of the underlying offense and thus fails to fulfill its constitutionally required function of narrowing the class of death eligible defendants. The Defendant was convicted of first degree murder based upon his criminal responsibility for the conduct of Corey Milliken. The statute defining criminal responsibility provides, in pertinent part:

> A person is criminally responsible for an offense committed by the conduct of another if:
>
> . . .
>
> (2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]

Tenn. Code Ann. § 39-11-402. One of the aggravating factors found to be applicable to the Defendant then provides:

> The defendant committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration or the promise of remuneration[.]

Id. § 39-13-204(i)(4). The Defendant thus argues that he was unlawfully convicted of first degree murder and sentenced to death based upon the same element: soliciting another to commit the act.

In Zant v. Stephens, 462 U.S. 862 (1983), the United States Supreme Court stated that in order to comply with the Eighth Amendment to the Constitution, aggravating circumstances must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." Id. at 877. Our supreme court has maintained that "[a] proper narrowing device, therefore, provides a principled way to distinguish the case in which the death penalty was imposed from the many cases in which it was not." State v. Middlebrooks, 840 S.W.2d 317, 343 (Tenn. 1992). In Middlebrooks, a majority of our supreme court held that when a defendant is convicted of first degree felony murder, application of the felony murder aggravating factor to the felony murder offense provides no narrowing of death-eligible defendants because the aggravating factor duplicates the elements of the offense. Id. at 346. However, our supreme court has also examined the situation at issue in this case, and it held that the "aggravating circumstance -- [that] the defendant employed another to commit the murder for remuneration or the promise of remuneration -- does not duplicate the elements of the offense [of first-degree murder], even incorporating the criminal responsibility statutes." State v. Stephenson, 878 S.W.2d 530, 557 (Tenn. 1994). The court concluded,

> Constitutional narrowing is accomplished because at the sentencing hearing, the State was required to prove that this defendant hired someone to kill his wife, or promised to pay someone to kill his wife. Obviously, not every defendant who is guilty of first-degree murder pursuant to the criminal responsibility statutes has also hired another or promised to pay another to commit the murder. Thus, the aggravating

-33-

circumstance found by the jury in this case narrows the class of death-eligible defendants as required by State v. Middlebrooks.

Id. Accordingly, we conclude that the aggravating circumstance was properly applied to the Defendant in this case.

## 9.  PROPORTIONALITY REVIEW  [OMITTED]

## 10.  UNLIMITED PROSECUTORIAL DISCRETION

The Defendant asserts that due to the unlimited discretion of prosecutors in Tennessee as to whether or not to seek the death penalty in a given case, the death penalty is imposed in an arbitrary and disproportionate manner in violation of the Eighth and Fourteenth Amendments to the United States Constitution.  He further asserts that the prosecutor's unfettered discretion to seek the death penalty is an improper delegation of judicial power in violation of Article II, section 2 of the Tennessee Constitution.  Both of these arguments have been previously rejected by our supreme court.

Applying the United States Supreme Court decision in Gregg v. Georgia, 428 U.S. 153, 198-99 (1976), our supreme court has held that

> opportunities for discretionary  action occurring during the processing of a murder case, including the authority of the state prosecutor to select those persons for whom he wishes to seek capital punishment do not render the death penalty unconstitutional on the theory that the opportunities for discretionary action render imposition of the death penalty arbitrary or freakish.

State v. Cazes, 875 S.W.2d 253, 268 (Tenn. 1994); see also State v. Brimmer, 876 S.W.2d 75, 86 (Tenn. 1994); State v. Hall, 958 S.W.2d 679, 716 (Tenn. 1997).  Moreover, in Hall, our supreme court expressly rejected the assertion that prosecutorial discretion to seek the death penalty violated the separation of powers doctrine found in Article II, section 2, of the Tennessee Constitution.  Hall, 958 S.W.2d at 716-17.  Thus, this issue has no merit.

## 11.  DISCRIMINATORY IMPOSITION OF DEATH PENALTY

Finally, the Defendant argues that the death penalty is imposed in a discriminatory manner on the basis of race, geography, and gender in violation of the Eighth and Fourteenth Amendments to the United States Constitution.  This argument has been rejected by our supreme court.  See Hall, 958 S.W.2d at 717; Brimmer, 876 S.W.2d at 87 n.5; Cazes, 875 S.W.2d at 268.  Furthermore, in support of his argument, the Defendant cites general statistics which he says reflect the discriminatory imposition of the death penalty; yet, the record contains no evidence indicating improper discrimination regarding the sentencing of this Defendant.  Statistics alone are insufficient

to establish that the Defendant's sentence was constitutionally deficient. <u>See</u> <u>McClesky v. Kemp</u>, 481 U.S. 279, 292-97 (1987); <u>Hall</u>, 958 S.W.2d at 717.

## CONCLUSION

After a thorough review of the record, we find no reversible error on the part of the trial court. Additionally, we conclude that the Defendant's sentences of death are not disproportionate to other cases in which the death penalty has been imposed. The Defendant's convictions and his sentences of death are therefore affirmed.

_____
DAVID H. WELLES, JUDGE