# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT NASHVILLE
November 16, 2004 Session

## STATE OF TENNESSEE v. BARRY WAYNE DUNHAM

**Direct Appeal from the Criminal Court for Macon County**
**No. 97-71      J. O. Bond, Judge**

---

**No. M2003-02802-CCA-R3-CD - Filed March 1, 2005**

---

The defendant, Barry Wayne Dunham, was convicted by a Macon County Criminal Court jury of the first degree premeditated murder of his father and sentenced to life imprisonment.   On appeal, he argues that the trial court erred by: (1) restricting defense counsel's voir dire of the jury venire; (2) interfering with defense counsel's examination of a witness and denying the defendant's motion for a mistrial based on the court's allegedly prejudicial commentary on the witness's testimony; and (3) disallowing a defense expert witness on the subject of domestic violence.  Finding no reversible error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which THOMAS T. WOODALL, J., joined. JOSEPH M. TIPTON, J., filed a dissenting opinion.

B. F. "Jack" Lowery and G. Jeff Cherry, Lebanon, Tennessee (on appeal); Comer L. Donnell, District Public Defender, and Thomas H. Bilbrey, Assistant Public Defender (at trial), for the appellant, Barry Wayne Dunham.

Paul G. Summers, Attorney General and Reporter; Richard H. Dunavant, Assistant Attorney General; Tom P. Thompson, District Attorney General; and Robert N. Hibbett, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

On June 2, 1997, the Macon County Grand Jury charged the defendant with premeditated first degree murder for the April 23, 1997, shooting death of his father, Clinton Dunham.  On October 5, 1998, the defendant pled guilty to second degree murder in exchange for a twenty-five-year sentence.  However, he was later granted post-conviction relief on the basis that his sentence, which was ordered to be served at 85% parole release eligibility rather than the 100% required by

the violent offender statute, was illegal and his guilty plea therefore unknowing and involuntary. See Barry Dunham v. State, No. M2000-02557-CCA-R3-PC, 2002 WL 242356, at *1 (Tenn. Crim. App. Feb. 11, 2002). The defendant was subsequently tried before a jury, found guilty of first degree murder, and sentenced to life imprisonment.

We confine our summary of the lengthy trial proceedings to the facts relevant to the issues presented in this appeal. According to the State's proof, the defendant killed the victim with a single rifle shot to the head at close range as the victim lay either asleep or passed out on his couch in his home in Red Boiling Springs.[1] The defendant wore gloves to avoid leaving fingerprints and obtained the murder weapon, a 30-30 rifle, from the victim's home. After the shooting, the defendant leaned the rifle against an inside wall near the back door and immediately drove to Gamaliel, Kentucky, where he spent the night with his girlfriend before returning early the next morning to "discover" the victim's body and call 9-1-1. Although he initially denied any involvement in the crime, he eventually made a full confession. Accordingly, his trial defense strategy included an attempt to show that the killing occurred in self-defense and that the lingering effects of his earlier stroke, combined with his intoxicated state, prevented him from forming premeditation. To that end, he presented proof, among other things, that the victim was an alcoholic and a violent and abusive man. He also presented evidence that the victim was under indictment for the murder of Joe Frank Newberry at the time of his death and had stated his intention of killing two of the witnesses who planned to testify against him at his upcoming trial.

Special Agent Roy Copeland of the Tennessee Bureau of Investigation ("TBI") conducted the initial interview of the defendant at the crime scene on April 24, 1997. At that time, the defendant claimed the victim was asleep when he last saw him the previous evening at 9:00 or 9:15 p.m. before leaving to spend the night with his girlfriend in Kentucky. Agent Copeland acknowledged he learned during the course of his investigation that the victim was a heavy drinker and that he had a reputation as a violent man.

On May 5, 1997, TBI Special Agent Jason Locke interviewed the defendant at the Macon County Sheriff's Office. During that interview, the defendant stated that he had spent the morning of Wednesday, April 23, 1997, at the victim's house with the victim and Cynthia Denham, where they discussed the victim's plans for burning his house to collect insurance money to pay his attorney's fees. The defendant also stated that the victim admitted to him in February 1997 that he had killed Newberry and shot at Newberry's wife, Francis, because Newberry had stolen some chainsaws from him.

---

[1]Evidence supporting the State's theory that the victim was asleep or unconscious at the time of his death included the defendant's statement as well as the position in which the victim's body was found, with his head on a pillow, arms crossed over his stomach or chest, blanket covering his body from feet to mid-torso, and partial denture removed from his mouth and lying on top of the blanket on his stomach. In addition, the pathologist who performed the autopsy of the victim's body testified his blood-alcohol level was .12% and his urine drug screen was positive for benzodiazepines at the time of his death.

On May 6, 1997, Agent Locke conducted a second interview in which the defendant ultimately confessed he shot and killed the victim after the victim told him of his plans to kill Francis Newberry and James Lyons, a friend of the defendant's, in order to prevent them from testifying at the victim's murder trial. The defendant's May 6 statement, which Agent Locke read aloud to the jury, states as follows:

On Wednesday, April 23, 1997, we had a bunch of friends over at the pool room behind my dad's house. Before everyone got there, [D]ad and I had been talking in the pool room. We talked about me having a cocaine problem and I told him I didn't have one. We also talked about him burning the house down the following Friday night for insurance money to pay his attorney. I had been helping him, and Cynthia Denham, move furniture and other things out of the house over the past week.

Dad told me he was going to kill Francis Newberry before he was going to leave town early Saturday morning. He also said he was going to kill James Lyons because they were both going to testify against him. When he started telling me about James, he could tell I was getting upset and he said, "[L]et's just drop it."

I helped him move a couple of chairs & a loveseat out after that and everybody came over a little while later.

Dad went inside at about 8:00 p.m. to go to sleep and everyone else left at about 8:15 p.m. I left the pool room at about 8:30 p.m. and went to my trailer next door. I called my wife in Myrtle Beach, S.C. & talked to her for 15-25 minutes.

I then walked over to [D]ad's & got a pack of cigarettes and hung up the cordless phone. I walked back to the trailer. I thought about James who used to be a good friend of mine and what [D]ad had said about killing him. I had been drinking and still was. I called Sabrena Green and she asked me to come over and I told her I would be over in 30 minutes to an hour. I changed clothes & put on my new blue jeans & cologne. I was headed out the door. I took a big drink of Canadian Mist and the thought hit me about killing [D]ad. I put my cup and liquor in the car and sat down inside the car and lit a cigarette. I put it in the ashtray and got out.

I walked to the back door and went inside. I knew there was no way to wake [D]ad up. I got the 30-30 rifle from behind the kitchen door and cocked the rifle twice & put two shells in the floor to make it look like a woman had done it.

I walked up to the couch where [D]ad was and put the gun about a ½ inch to an inch away from his head and shot him. I turned around and walked out, shut the back door after putting the rifle against the wall and left. Before I had gone inside the house, I put on a pair of gloves that was on the back deck under a duck on top of

-3-

the well house so I wouldn't leave any fingerprints. I don't know what happened to the gloves.

I left and went to Sabrena's. I came home the next morning and got there at 6:10 a.m. I changed clothes and walked over to [D]ad's. I made the phone call to Sandy [defendant's sister] and then to 911 and then walked down to the trailer and got Timmy [defendant's half-brother] up.

Macon County Sheriff Joe Ferguson, who participated in the May 6 interview, testified that after being interviewed for some time, the defendant looked him in the eye and said, "Joe, you have got me." When he asked the defendant what he meant, the defendant replied that he had killed his father and went on to give the statement about the killing. Sheriff Ferguson testified he was also present later that night at the jail when one of the defendant's sisters asked the defendant if he had killed their father and the defendant replied, "[Y]es, I did." Sheriff Ferguson acknowledged that the victim was under indictment for the murder of Joe Frank Newberry at the time of his death and that the defendant replied to his sister, when she asked him why he had committed the crime, "because it was never going to stop," or words to that effect.

Timothy Gravens, the defendant's half-brother by the same mother, was sharing a house trailer on the victim's property with the defendant at the time of the shooting. He described the defendant and the victim's relationship as "pretty rough," testifying that the victim had threatened to shoot the defendant and burn his car and that both men had made comments to him at various times about killing the other. He acknowledged the victim, in addition, had commented to him about killing Newberry and the witnesses to Newberry's murder, Francis Newberry and James Lyons. He further acknowledged the victim often mistreated the defendant, calling him "worthless" and telling him he "wasn't no good," and the victim was violent to other people and abusive to animals. Gravens was aware of the victim's plans to burn his house and was present at the jail when the defendant said the reason he killed the victim was "because it was never going to stop."

Roger Dale Denham, the victim's brother, testified the defendant told him in a conversation the week before the shooting that the victim was getting on his nerves and he wanted him back on the boat. Denham later explained that the victim worked on a river barge and was regularly absent from home for weeks at a time. Denham testified the victim left Macon County when the defendant was a small child and remained away for years because he "got in so much trouble" with the law over "break ins and everything." He conceded the victim "was a little mean" and had a reputation as a violent man when he was "on the liquor." According to Denham, the victim once shot a jukebox in a bar, at another time fired his pistol in a bar, causing a bullet to ricochet off the wall, and at yet another time threatened to shoot Denham's girlfriend.

Donna Trisdale, the defendant's sister, testified the victim and the defendant did not have a good relationship and got into arguments whenever they were together. She said when she and her siblings asked the defendant at the jail why he had killed their father, he replied that "it had to be stopped." Trisdale testified on cross-examination that the victim was sober only about half the time

and that she avoided him when he was drinking. She acknowledged the victim told her he killed Newberry because Newberry stole two chainsaws from him and that the victim also told her of his plans to burn his house.

The first witness the defendant presented in his defense was his younger sister, Sandy Dugan. Dugan testified the victim left home when she was six weeks old and the defendant was one or two years old. During the years that followed, she remembered meeting the victim when he returned for a visit when she was eleven and seeing him again during visits when she was approximately thirteen and sixteen. In 1991, the victim bought the property he owned at the time of his death and, in 1992, moved into the house located on the property. Dugan characterized the victim's relationship with the defendant as "good" except when the victim was drinking, which she acknowledged occurred frequently. She said the victim was often "ill and hateful" when on one of his drinking binges, and she related an incident in the kitchen of his home when he suddenly pulled out a gun and fired a shot that narrowly missed her. According to Dugan, the victim told her before Newberry's murder that he planned to kill Newberry and bury his body in Hippie Hollow. After the murder, the victim told her he was going to have to kill the witnesses, specifically, Francis Newberry and James Lyons.

Dugan testified the defendant suffered a severe stroke in September 1996 that initially paralyzed the right side of his body and rendered him unable to speak, walk, or care for himself. Despite his eventual partial recovery, the defendant was not "the same person" after his stroke. The defendant was at her home the evening of Wednesday, April 23, 1997, when the victim telephoned and said, "[Y]'all get y'all's a-s-s out here." Recognizing from the victim's voice that he was drunk, she made an excuse about attending church but dropped the defendant off at the victim's house as the victim instructed.

Dugan explained that she knew what the defendant meant when he told her that he had killed the victim because it was "never going to stop":

[A]nd I said, Barry, why did you do it? And he said because it wasn't [sic] never going to stop. I said, regardless, you killed Daddy, and he started crying and he said, I had to do it. I had to do it so it would stop, and I knew what he was going through and what he felt, because I knew all of this stuff that was going on and it shouldn't have been going on, wasn't supposed to be that way. It's not supposed to be that way.

Q. By that, you mean the killing of witnesses?

A. Yeah, just the way it went in general, just the way it all went, just wasn't supposed to be that way. There was [sic] positions and situations that we should never have been put in, things we never should have seen and experienced. He was doing things our kids going to school was [sic] having to hear about. People was [sic] calling me at the factory and would say, do you know what I heard your daddy

-5-

done [sic] last night? Me and Donna [sic] would leave and go find Daddy, find out what in the world he'd done. It was just something all the time.

The defendant testified he currently lived in the victim's house and that he received social security disability benefits as a result of his stroke. He said he did not have any kind of regular relationship with the victim until March 1996 when he came back to Tennessee and moved in with Gravens, who was living in the trailer beside the victim's home. He characterized his relationship with the victim as good when the victim was sober but bad whenever the victim was drinking, which was often. He said that on one occasion when he refused to do something the victim had asked, the victim pulled a .38 from a cabinet and fired six shots at him, three between his legs as he was sitting at the table and three more after he had run outside onto the deck. He also described another occasion in which the victim threatened him when he was reluctant to let the victim use his car. Further, he corroborated Dugan's testimony that he was present at the time the victim fired his gun at Dugan.

The defendant testified his severe stroke, which occurred on September 6, 1996, left him unable to speak with any clarity for three or four months and unable to walk without the assistance of a walker or cane. During his recuperation, the victim, when drinking, "always put [him] down," telling him that he would "never be worth a shit again and things like that." The defendant testified the victim described to him how he had killed Newberry. He said the victim told him he shot Newberry as he and Mrs. Newberry were going out the door, tried for Mrs. Newberry but missed, followed Newberry to his truck, shot him again, instructed Lyons to come pick him up at Hippie Hollow, and then drove Newberry in his truck to Hippie Hollow, where he shot him six more times. The defendant said the victim also spoke several times with him about his plans to burn his house and, on the evening of April 23, 1997, told him he was "going to get rid of" James Lyons and Mrs. Newberry before renting a car on Friday or Saturday and leaving town. That same night, the victim told him to retrieve the dynamite that he and Lyons, per the victim's instructions, had earlier buried.[2]

The defendant testified he had taken a morphine pill that afternoon and had also consumed about a half-gallon of whiskey. He said he donned the gloves with the intention of retrieving the dynamite but went directly inside the victim's house, picked up the murder weapon, and shot the victim. He testified he "was scared because [the victim] made the statement that he wasn't going to leave any witnesses, and he was a dangerous man." In addition to the victim's other violent acts, the defendant was aware of the victim's having shot a man in the buttocks and kneecap in a bar and having fired shots in a bar on another occasion in order to clear people from the pool table.

On cross-examination, the defendant conceded that the victim did not like cocaine usage but denied that the victim would have forced him to move out of the trailer if the victim had found out he was using cocaine. He further denied the "thought hit him" about killing the victim or that he sat

---

[2]James Lyons later testified that he remembered the victim's having instructed him and the defendant to hide the dynamite, which, he said, they buried in Hippie Hollow. During his cross-examination testimony, Sheriff Ferguson acknowledged a dynamite cap and possibly one stick of dynamite had been uncovered on the victim's property.

in his car for a while before entering the house. He testified he did not eject the shells on the floor to make it appear as if a woman had committed the crime, as he reported in his May 6 statement, but the rifle had failed to fire when he first pulled the trigger and he had returned to the kitchen to check if a bullet was in the chamber:

> The reason the two shells were in the floor is because I went in to – at first when I was going to kill him, I guess I didn't have a bullet in the chamber so it didn't go off or misfired or something. I don't think there was a bullet in the chamber, so I walked back in the kitchen, ejected two shells out and walked back in there.

The defendant claimed he was not aiming at the victim's head when the fatal shot was fired but, instead, was holding the weapon down at his side when the back door slammed shut and the gun discharged.[3] He said he was not himself because of the severe brain damage he had suffered and insisted he made no decision to kill the victim. Asked whether "it [was] self-defense or . . . an accident or [he] just didn't know what [he was] doing," the defendant replied that he "really didn't know what [he] was doing."

Francis Newberry related the events of January 16, 1997, when her husband was murdered, describing how she heard popping sounds as she and her husband were leaving the victim's house, looked back to see her husband fall, and then ran when he told her the victim had shot him and instructed her to flee. She said the victim was an "ill-like person" and a violent man and she was afraid of him. She had never heard the victim threaten the defendant but had heard him say mean and hateful things to him. James Lyons, who was present at the victim's house on January 16, 1997, described the victim's killing of Newberry[4] and said the victim was violent when he was drunk.

Kenny Frazier described a number of violent episodes involving the victim. He testified the victim twice threatened him, on one occasion shooting a gun around his feet and on another occasion pulling a gun and threatening to shoot him. He said he also witnessed the victim empty his gun into a car radio because he did not like the music, shoot a jukebox because a rock and roll song came on instead of the country music he requested, shoot stray animals that came onto his property, and pour alcohol on an African-American man in a bar and attempt to set him on fire with a lighter. Frazier additionally testified he was at the Valley View Tavern one night when a Mr. Tuck was shot. Although he did not witness the actual shooting, the victim was the only one present who had a gun.

Vesper Newberry, the owner of the Valley View Tavern, confirmed that a man had been shot one night after closing time outside his tavern and that the victim had been present in the tavern before closing. He said the victim did not have a good reputation in the community.

---

[3]During the State's case in chief, TBI Special Agent Steve Scott, a firearms expert, testified that at the time he examined it, the murder weapon, including its safety mechanism, was in proper working condition.

[4]Lyons' account essentially corroborated the details the defendant testified the victim had provided to him about the murder.

Dr. Pam Auble, a neuropsychologist, testified the defendant had a full-scale I.Q. of 75. She said she diagnosed him with dementia resulting from his stroke and from alcoholism, and she opined that these factors prevented him from being able "to exercise reflection and judgment at the time of [the] offense." Dr. Keith Caruso, a forensic psychiatrist, testified he interviewed the defendant and reviewed Dr. Auble's report and concurred in Dr. Auble's findings and results. Specifically, he diagnosed the defendant with an anxiety disorder not otherwise specified ("anxiety disorder NOS"), dementia due to stroke, chronic alcohol abuse, polysubstance abuse, and alcohol dependence, as well as alcohol intoxication at the time of the offense. Dr. Caruso testified the defendant's anxiety disorder NOS caused him to have "a tendency to misperceive or inaccurately judge the degree of threat that was posed at a particular time," and his dementia created problems for him with "reasoning and planning." In sum, he thought there was "a lot to suggest" that at the time of the offense the defendant "was not free of passion and excitement." He acknowledged, however, that it was "certainly" possible the defendant had acted with premeditation.

## ANALYSIS

### I. Restriction of Voir Dire

The defendant contends the trial court erred in restricting defense counsel's voir dire of potential jurors. Asserting that the entire jury venire was prejudiced by its exposure to two venire members' negative opinions about a defendant's choice not to testify, the defendant argues that the trial court should have permitted defense counsel to question the remaining venire members individually about their respective views on the subject.

The purpose of voir dire is to ensure that jurors seated at trial are competent, unbiased, and impartial. See State v. Mann, 959 S.W.2d 503, 533 (Tenn. 1997). The trial court is granted broad discretion in deciding the manner in which voir dire will be conducted, and its decisions in this regard will not be disturbed on appeal absent a showing of abuse of discretion. See State v. Austin, 87 S.W.3d 447, 471 (Tenn. 2002) (citing State v. Stephenson, 878 S.W.2d 530, 540 (Tenn. 1994)), cert. denied, 538 U.S. 1001, 123 S. Ct. 1899, 155 L. Ed. 2d 829 (2003). We review this issue, therefore, under an abuse of discretion standard.

The trial court dismissed two prospective jurors after they indicated they would hold a defendant's choice not to testify against him, despite the trial court's instructions to the contrary. Following their dismissal, defense counsel sought to ask the venire "one more time" if anyone else would have a problem with a defendant's electing not to testify. The trial court declined the request, noting that it had just "got[ten] through with it" and that none of the remaining prospective jurors had indicated they would have any difficulty following the court's instructions on the topic.

We find no abuse of discretion by the trial court in this matter. Although Rule 24(a) of the Tennessee Rules of Criminal Procedure provides that the trial court "shall permit questioning by the parties for the purpose of discovering bases for challenge for cause and enabling an intelligent exercise of peremptory challenges," the trial court has the discretion to "control[] the questions that

can be asked to keep the voir dire within relevant bounds." Austin, 87 S.W.3d at 476 (adopting in appendix portions of opinion of this court). The record reflects that the trial court allowed defense counsel to ask several times whether anyone had a problem with a defendant's choice not to testify and that it removed the two potential jurors who indicated they did. Furthermore, the court issued extensive instructions to the venire members about their duty in this regard, including the following after the first potential juror who expressed his concerns, one of the two who was ultimately dismissed, stated he thought a defendant "ought to tell people how it happened or whatever":

> Well, let me explain how the burden of proof -- the Defendant doesn't have to prove anything, absolutely nothing. The State of Tennessee has the full burden of proving the Defendant guilty. The Defendant does[n]'t have to prove his innocence; he doesn't have to say anything under our Constitution.

> The State has that burden. They have to do that. In order to carry the burden of proof, they've got to put the proof on, and you can't hold it against any citizen for not testifying. There's a lot of reasons for not testifying; they're not necessarily not going to tell the truth; there's a lot of reasons why.

The court continued by suggesting that "[s]ome people don't speak well" and that others might not react well to the stress of being on the witness stand. It then reiterated that the jury had to begin with the presumption of the defendant's innocence and that the only thing it could consider in determining whether he was guilty of the crime was the proof presented at trial.

The trial court repeated similar admonitions when two additional venire members expressed their concerns about a defendant's choosing not to testify. Of those two, the trial court dismissed the member who steadfastly expressed the opinion that a defendant "should have to come forward [to testify]" and retained the member who affirmed he could abide by the court's instructions. Thus, by the time defense counsel requested to "ask it one more time," the topic had already been thoroughly explored, with the trial court having given extensive instructions on a defendant's constitutional right not to testify and the fact that the jury could not hold it against him and the venire members afforded every opportunity to indicate if they had any problems with the concept. We conclude, therefore, that this issue is without merit.

## II. Interference in Examination of Witness and Denial of Motion for Mistrial

The defendant argues the trial court erred by interfering with defense counsel's examination of defense witness Sandy Dugan, by making comments in the jury's presence which "could be construed as an indication that he had reservations about Ms. Dugan's credibility and about the innocence of the defendant," and by denying defense counsel's immediate motion for a mistrial on the basis of those comments. The State argues that any error in the trial court's restriction of defense counsel's examination of Dugan was harmless in light of the cumulative testimony. The State further argues that the trial court did not abuse its discretion in denying the defendant's motion for a mistrial, asserting that the court never commented on the credibility of witnesses or on the guilt

or innocence of the defendant but instead merely observed that the testimony defense counsel sought to elicit was redundant.

The propriety, scope, manner, and control of testimony and other evidence are matters entrusted to the sound discretion of the trial court. See State v. Hutchison, 898 S.W.2d 161, 172 (Tenn. 1994); State v. Barnard, 899 S.W.2d 617, 624 (Tenn. Crim. App. 1994) (citing State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978)); see also Tenn. R. Evid. 611. "Absent a clear abuse, which has resulted in manifest prejudice to the accused, this court will not interfere with the trial court's exercise of its discretion in matters pertaining to the examination of witnesses." State v. Humphreys, 70 S.W.3d 752, 766 (Tenn. Crim. App. 2001) (citing Coffee v. State, 188 Tenn. 1, 4, 216 S.W.2d 702, 703 (1948)). Similarly, whether or not to grant a mistrial lies within the sound discretion of the trial court, and we will not disturb the court's decision in this regard absent a clear showing of abuse of discretion. State v. Land, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000) (citations omitted). A mistrial should be declared in a criminal case only when something has occurred that would prevent an impartial verdict, thereby resulting in a miscarriage of justice if a mistrial is not declared. See id. (citing State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994)); State v. Jones, 15 S.W.3d 880, 893 (Tenn. Crim. App. 1999) (citing Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977)). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991) (quoting Arnold, 563 S.W.2d at 794). The burden to show the necessity for a mistrial falls upon the party seeking the mistrial. Land, 34 S.W.3d at 527 (citing State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996)).

A review of exactly what transpired at trial is helpful in understanding this issue. Asked on cross-examination whether the victim, who was killed on a Wednesday, had been planning to rent a car on Thursday and return to the river barge, Dugan replied, "Yeah, well, no, that ain't what -- after the fact and the way I know Daddy the way that I do, I know some of the things that Daddy had in his mind he was going to do." On redirect examination, defense counsel sought to question her about that statement and the following exchange occurred:

Q. You mentioned about that you understood that your father was going to be leaving out or getting a rental car on Thursday morning.

A. (Witness nods head affirmatively).

Q. And then you made the statement, "some of the things that he had on his mind." Was he planning on killing some witnesses before he left town[?]

THE COURT: Now, she's reading his mind, so that objection is sustained if that's mind reading.

[FIRST DEFENSE COUNSEL]: Let me rephrase the question. Had he told you that he was planning on killing some witnesses before he left town?

THE COURT: No. That's not the question you started out.

[FIRST DEFENSE COUNSEL]: Well, I know, but I rephrased the question.

THE COURT: At the time she dropped off [the defendant], did he make any statements? You've already got up to that one.

[FIRST DEFENSE COUNSEL]: I'm talking about before [the victim] was scheduled to go back out of town on the barge.

THE COURT: You've already asked that before.

[SECOND DEFENSE COUNSEL]: Can't he ask it again?

THE COURT: Well, why should he ask it again? He didn't –

[SECOND DEFENSE COUNSEL]: Well, I don't think he asked it–

THE COURT: He did ask her. I know that she was asked that question, had she heard from him that he was planning on killing witnesses. I know that was her. Now, why would you go back into it again? This Jury is an intelligent Jury. They hear it one time, and that's enough. You don't have to keep pounding them with the same thing over and over, same witness.

[FIRST DEFENSE COUNSEL]: I didn't think it had been asked in the context of the immediacy of just before he drove into [sic] town.

THE COURT: From the time she dropped off [the defendant], she would had to have learned it from then, because he's already testified she dropped him off and didn't see anybody again after that.

THE WITNESS: Not that day, no.

THE COURT: And the next time you saw him, he was already dead?

THE WITNESS: Right.

THE COURT: Anything else?

[FIRST DEFENSE COUNSEL]: No.

THE COURT: You may step down. Thank you. Next witness.

(Witness excused.)

[FIRST DEFENSE COUNSEL]: Your Honor, may we approach the bench just a minute?

(A bench conference was held outside the hearing of the Jury on the record as follows:)

[SECOND DEFENSE COUNSEL]: We respectfully move for mistrial, Your Honor, please, based on Your Honor's recent statements as to the evidence, the statements that were just made.

THE COURT: I made a ruling on admissibility, and that's all I made.

[SECOND DEFENSE COUNSEL]: Your Honor, please, the comments that you made are –

THE COURT: Because you kept arguing about it. You are the ones that -- you brought it up. You're trying to get in a last shot, just get it in one more time, and the Court's not going to let you do that. I know what she testified to before. I know that it was repetitive, and that's what I was ruling, and, of course, the Jury was in here, so deny the mistrial.

The record reveals that, although Dugan had previously testified on both direct and cross-examination that the victim told her he was going to kill the witnesses to Newberry's murder, she had not yet been asked whether the victim told her when he planned to commit the crime, specifically, whether he mentioned that he was going to kill the witnesses before leaving town on Thursday, April 24, to return to the river barge. She had, however, already been asked on direct examination a general question about when the conversations with the victim about killing witnesses occurred:

Q. And also now, we're probably up, Ms. Dugan, to I guess about April of 1997, and that's when this talk -- was that about the time that this talk was that he had to get rid of the witnesses?

A.  No.  He talked about it several different times.  He talked about the trip. He was home two trips.  Between when he left after Joe [Newberry] died and from the time he died, he was on two trips that I recall, and he had mentioned it both times, talked about it both times.

In light of the circumstances, we agree with the State that any error that may have resulted from the trial court's ruling is harmless.  Given Dugan's relatively verbose testimony and frequent tendency to ramble, it appears unlikely that she would not have availed herself of the opportunity, presented above, to reveal that the victim had told her he planned to kill the witnesses before leaving town, if such, in fact, had been the case.  Her choice of words on cross-examination, "after the fact and the way I know Daddy the way that I do," further supports the conclusion that she knew nothing prior to the victim's death of any specific plans he had to commit the crime before departing for the river barge.  We further agree with the State that there is nothing in the trial court's comments that can be interpreted as a commentary on the credibility of the witness or on the guilt versus innocence of the defendant.  We conclude, therefore, that the trial court did not abuse its discretion in denying the defendant's motion for a mistrial.

### III.  Disallowing Expert Witness on Familial Violence

At trial, the defendant unsuccessfully sought to present the testimony of Dr. Ann Goetting, a sociologist who specialized in domestic violence.  In a jury-out proffer, Dr. Goetting testified she received a doctorate in sociology in 1978 and had been a professor of sociology at Western Kentucky University for twenty-five-and-one-half years.  She said that in addition to numerous peer-reviewed articles, she had authored three peer-reviewed books, including Homicide in Families and Other Special Populations, in which she researched, reviewed, and analyzed case files of "husbands who killed wives [and] wives who killed husbands," and Getting Out, Life Stories of Women Who Left Abusive Men, her most recent book about "hierarchical relationships between husbands and wives" in which "the power can be abused and the woman in those relationships can legitimately come to fear her husband and ultimately that relationship of fear can end where she believes justifiably and rationally that he can and will kill her and she kills him in self-defense."

Dr. Goetting acknowledged she had not done any research on children who kill parents, but she testified she had reviewed the work of the country's leading expert in that field.  That fact, combined with the similarity she saw between the abusive relationship between domineering husband and wife and domineering parent and child, led her to feel competent to give expert testimony in the defendant's case:

[S]o I've done some of the research myself that has been peer reviewed, but also, I can say I've read all important other research of the same kind in my area, so because

-13-

I've read all these other cases of everybody else, for example, Paul Monez (phonetic)[5] is the country's expert on children who kill their parents; I've not specifically interviewed those kinds of cases. I've read all of his work and watched some of his cases in some transcripts.

I, myself, have studied women who have killed their husbands in self-defense, and there's a lot of similarity between the two. The[re] are cases where hierarchical relationships go out of control and end in violence, so I've done the research, I've interviewed people; I've read everybody else's research. That information that accumulates from the work I've done and Paul Monez and other people, we build a model. This is what those relationships look like; this is how they progress in intensity and in fear. This is how typically things are done so we know, for example, normally if children kill parents, it's typically with a gun; it's after some kind of abuse. I mean, I can list from hundreds and hundreds of studies in this country what typically, it's called grounded research. It's just grounded in fact after case after case after fact.

So we look at it, and we have this model here, and then we take a case and we interview all of the clients, and we just -- we have some questions that are indirect to see if what was going on with that person is very similar to what happened here. We're never there, but we simply place it in a model.

Dr. Goetting testified she spent approximately eleven hours in conversation with the defendant during which she asked probing questions "to see if what he would say to [her] would sound like the work of Paul Monez [sic] and [her] own work and many other experts," explaining that she wanted to know if the defendant's answers would "place him as . . . a likely member of that model." She said the defendant's responses led her to conclude that he did, in fact, fit the model and that his "entire relationship with his father had been one of fear." She based that conclusion, in part, on the fact that the defendant's aunt had consistently told the defendant stories during his early childhood about how the victim had beaten the defendant's mother, hurt other people, and abused animals and on the fact that the defendant's own experiences with the victim during adolescence, albeit infrequent, had involved intimidation, humiliation, and fear. As an example, Dr. Goetting related having learned that the victim at one time threw the defendant and his sister into a pond to teach them to swim. She said that the defendant himself had no memory of the event, but other family members had told him about it.

Dr. Goetting testified the stroke the defendant had suffered made him "intellectually . . . more like a child," and he, therefore, "fit the model of a boy and his father whereby the father had terrified him his whole life and he was in a position where if he did what his father asked him to do that night,

---

[5]We note that the correct spelling of this individual's name is apparently "Mones." See State v. Smullen, 844 A.2d 429, 447 (Md. 2004) (citing Paul Mones, "Parricide: Opening a Window Through the Defense of Teens Who Kill," 7 Stan. L. & Pol'y Rev. 61, 63 (Winter, 1995-96)).

he would be dead, and if he didn't do what his father asked him to do that night, he would be dead." She said the defendant had no way to support himself after the stroke and no way to leave the victim. In addition, the defendant believed the victim "had 'the police in his pocket'" and, therefore, was "certain in his mind that the police wouldn't help him."

Dr. Goetting testified the defendant's having learned that the victim planned to kill Lyons, who had always been a close family friend and whom the victim professed to love, led the defendant to believe that his own death at the hands of the victim was imminent. On cross-examination, she testified her first interview with the defendant did not occur until five years after the victim's death, and she acknowledged that the handful of criminal cases in which she had previously been qualified as an expert witness involved husbands and wives, not parents and children.

After hearing the proffered testimony, the trial court refused to allow Dr. Goetting to testify before the jury, finding that she was not an expert in the field of adult children who kill their parents and that her testimony would not substantially assist the trier of fact:

> I've listened closely to this and I don't believe that I'll hold her as an expert in this field to take this testimony. This will be the first time that she has ever testified in a case such as this. She is a sociologist. She is relying on facts that we probably don't have in evidence here, the way it sounds, one thing. She got information from the defendant plus someone else there at the house with him, and from what I've heard here, I do not believe it would be beneficial for the jury to hear this, a substantial help to them in any way.
>
> . . . .
>
> They're going to get the full charge, but based on the testimony here in the Court that they might reach the conclusion she's reached, but that's for them to reach that conclusion, not for her to testify that before she would take the case, she had to be convinced of this person's inability to not kill [sic], or otherwise, she wouldn't have looked at the case.
>
> That is a statement going to the Jury this Court just couldn't allow, and the Court is going to deny this witness'[s] testimony.

The defendant relies on the language of the ruling quoted above to argue that the trial court failed to consider the proper State v. Stevens, 78 S.W.3d 817 (Tenn. 2002), factors in determining the reliability and credibility of Dr. Goetting's testimony. He asserts that Dr. Goetting qualified as an expert by virtue of her education, background, research in a closely related field, and extensive reading in the field of children who kill abusive parents and that her testimony would have substantially assisted the jury in understanding his theory of self-defense. The State argues that the trial court did not abuse its discretion in excluding Dr. Goetting as an expert witness on the basis that her proffered testimony was neither relevant nor reliable. In support, the State notes, among other

things, that there was no evidence that the victim ever physically harmed the defendant. Because "[q]uestions regarding the qualifications, admissibility, relevancy, and competency of expert testimony are matters left within the broad discretion of the trial court," id. at 832, we review this issue for an abuse of discretion.

We agree with the defendant that the fact that Dr. Goetting had not previously testified in a case involving parricide, that she offered her testimony in the form of an opinion, or that she based her opinion on facts not in evidence were not in themselves sufficient reasons for excluding her testimony. We cannot, however, conclude that the trial court abused its discretion in ruling that she did not qualify as an expert and that her testimony would not substantially assist the trier of fact under the circumstances presented in this case. Expert testimony must be both relevant and reliable. Id. at 832-33. In McDaniel v. CSX Transp., Inc., 955 S.W.2d 257 (Tenn. 1997), our supreme court provided the following non-exhaustive list of factors for a trial court to consider in determining the reliability of scientific evidence or expert testimony:

> (1) whether scientific evidence has been tested and the methodology with which it has been tested: (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether . . . the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

Id. at 265. In Stevens, our supreme court concluded that the McDaniel factors could, in an appropriate case, be applied along with other factors in determining the reliability of nonscientific expert testimony:

> Consequently, when the expert's reliability is challenged, the court may consider the following nondefinitive factors: (1) the McDaniel factors, when they are reasonable measures of the reliability of expert testimony; (2) the expert's qualifications for testifying on the subject at issue; and (3) the straightforward connection between the expert's knowledge and the basis for the opinion such that no "analytical gap" exists between the data and the opinion offered.

Stevens, 78 S.W.3d at 834-35. Before reaching that point, however, "the trial court must first make a determination that the witness is qualified by knowledge, skill, experience, training or education to express an opinion within the limits of the expert's expertise. The determinative factor is whether the witness's qualifications authorize him or her to give an informed opinion *on the subject at issue*." Id. at 834 (citations omitted).

Dr. Goetting acknowledged that her field of expertise was spousal domestic abuse and that her knowledge of the subject at issue was confined to the literature she had read by the country's leading expert on the topic. Neither she nor defense counsel offered any evidence with respect to that expert's qualifications or whether the correlation Dr. Goetting was attempting to draw between battered wives who kill husbands and battered children who kill parents was one that was commonly

-16-

recognized and accepted among professionals in her field. Dr. Goetting also acknowledged that her first interview with the defendant did not take place until approximately five years after the crime occurred. Thus, we cannot fault the trial court for finding that Dr. Goetting was not qualified to testify as an expert witness in this case.

Furthermore, even if we were to conclude that Dr. Goetting qualified as an expert by virtue of her education and reading of the applicable literature, we would still agree with the State that her testimony would not have been relevant. In a recent case, State v. Smullen, 844 A.2d 429, 448-49 (Md. 2004), Maryland's highest court concluded that, although evidence on battered child syndrome is generally admissible in that state as an extension of a statute authorizing admission of evidence relating to battered spouse syndrome, it should not be admitted without foundational evidence in its support:

> What evidence was offered by Bruno [adolescent defendant who stabbed adoptive father to death as victim was reading newspaper] that might support a conclusion that he was suffering from battered child syndrome and thus provide an explanation of how and why he perceived the threat of imminent death o[r] serious bodily harm from Warren [defendant's adoptive father]? There was no evidence, either admitted or proffered, of the kind of repetitive cycle of violence that lies at the heart of the syndrome. No one ever saw Bruno being assaulted by Warren or exhibiting any injuries from such an assault. . . .

> . . . .

> This paucity stands in stark contrast to the kind, intensity, and severity of behavior that courts *have* found sufficient to allow evidence of battered child syndrome. . . .

> . . . .

> When a defendant claiming self-defense offers foundational evidence which, if believed, would establish the requisite pattern of abuse sufficient to provide a base for an expert opinion as to the battered spouse/child syndrome, it should be admitted, so that it can be followed by the expert testimony. The syndrome evidence would then play its proper role in explaining why and how, in light of that pattern of abuse, the defendant could honestly, and perhaps reasonably, perceive an imminent threat of immediate danger. To permit that kind of evidence in a case such as this, however, would detach the syndrome from its mooring and allow the jury to find that random and undefined acts of abuse perpetrated at undefined times in the past, none of which apparently caused serious physical injury, or required any medical attention, or attracted the notice of anyone in a position to notice them, can reduce a classic premeditated murder to manslaughter or acquittal. If used in that setting, the syndrome would, indeed, constitute an independent defense and assume a

significance unsupported by the psychological pillars upon which it properly rests. We recognize the doctrine, but there was no evidentiary basis for it in this case.

Id. at 451-53 (footnote omitted).

As in Smullen, there was no evidence that the defendant in the case at bar met the recognized definition, as we understand it to be, of a person suffering from "battered child syndrome." See, e.g., State v. Miller, 513 S.E.2d 147, 160 n.8 (W. Va. 1998) (Starcher, J., concurring) ("The *amici* point out that the 'battered child syndrome' has come to describe both the physiological and psychological effects of a prolonged pattern of physical, emotional, and sexual abuse. Such abuse typically lasts over a significant period of time and tends to operate in recurring patterns.") (citations omitted). The defendant was an adult at the time of the killing. He did not live with the victim and, by his own admission, had not had any contact with him, with the exception of infrequent, sporadic meetings that occurred while he was an adolescent, until 1996 when, as an adult, he moved back to Tennessee from another state. Moreover, although several witnesses described the victim's *verbally* abusive behavior toward the defendant and the defendant related an incident in which the victim fired gunshots in his direction, there was no evidence that the victim had ever physically battered the defendant, much less engaged in a recurring and prolonged pattern of physical or emotional abuse. Under such circumstances, we conclude that the trial court did not abuse its discretion by refusing to admit Dr. Goetting's proposed testimony.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE

-18-